William H. Downes, Appellant, *v.* Elmira Bridge Company,
Respondent.

Negligence — Injury Resulting from Building Operations on
Private Property.   Where dangerous work is in progress upon private
property which, although used by the public before the work was com-
menced, is in such a condition as to show that the former public use is
interrupted, one who goes thereon and is injured, not willfully or wan-
tonly, but by building operations lawfully and openly conducted in the
usual way, after he has knowingly and unnecessarily placed himself in a
position exposed to obvious danger, cannot maintain an action of negli-
gence to recover the resulting damages.

*Downes* v. *Elmira Bridge Co.*, 82 App. Div. 639, affirmed.

(Argued June 15, 1904 ; decided August 5, 1904.)

Appeal from a judgment of the Appellate Division of the
Supreme Court in the second judicial department, entered
May 2, 1903, affirming a judgment in favor of defendant
entered upon a dismissal of the complaint by the court at a
Trial Term.

The nature of the action and the facts, so far as material,
are stated in the opinion. .

*Edward J. McCrossin* for appellant.   Defendant owed
plaintiff the duty of exercising ordinary care in moving the
girder.   (*Beck* v. *Curtis*, 68 N. Y. 283 ; *Barry* v. *N. Y. C.
& H. R. R. R. Co.*, 92 N. Y. 289 ; *Byrne* v. *N. Y. C. &
H. R. R. R. Co.*, 104 N. Y. 362 ; *Swift* v. *S. I. R. T. R. R.
Co.*, 123 N. Y. 645 ; *Austin* v. *L. I. R. R. Co.*, 69 Hun, 67 ;
140 N. Y. 639 ; *Larkin* v. *N. Y. & N. R. R. Co.*, 46 N. Y.
S. R. 658 ; 138 N. Y. 634 ; *Larmore* v. *G. I. Co.*, 101
N. Y. 391 ; *Walsh* v. *F. R. R. Co.*, 145 N. Y. 301 ; *Demp-
sey* v. *N. Y. C. & H. R. R. R. Co.*, 81 Hun, 156.)   Plain-
tiff was not chargeable with contributory negligence as a mat-
ter of law.   (*Hoes* v. *E. G. E. Co.*, 161 N. Y. 37 ; *McRick-
ard* v. *Flint*, 114 N. Y. 229 ; *Pelletreau* v. *M. S. Ry. Co.*,
74 App. Div. 196.)

*Charles Mac Veagh* for respondent. Defendant's only duty to plaintiff under the circumstances of this case was to refrain from wanton and willful injury. (*Nicholson* v. *E. Ry. Co.,* 41 N. Y. 525 ; *Collis* v. *N. Y. C. & H. R. R. R. Co.,* 71 Hun, 504 ; *Boyle* v. *N. Y., L. E. & W. R. R. Co.,* 39 Hun, 171 ; *Magilton* v. *N. Y. C. & H. R. R. R. Co.,* 53 App. Div. 283 ; *Terry* v. *N. Y. C. R. R. Co.,* 22 Barb. 586 ; *Burk* v. *D. & H. C. Co.,* 86 Hun, 523 ; *Albert* v. *City of New York,* 75 App. Div. 556 ; *Wells* v. *B. H. R. R. Co.,* 67 App. Div. 212 ; *Collins* v. *N. Y., N. H. & H. R. R. Co.,* 8 N. Y. S. R. 165 ; *Ominger* v. *N. Y. C. & H. R. R. R. Co.,* 4 Hun, 159.) In attempting to pass between the iron girder and the stone pile, plaintiff assumed the risk of injury, and his act having contributed to the accident, he cannot recover. (*Belton* v. *Baxter,* 54 N. Y. 245 ; *Wendell* v. *N. Y. C. & H. R. R. R. Co.,* 91 N. Y. 428 ; *McClain* v. *B. C. R. R. Co.,* 116 N. Y. 465 ; *Collis* v. *N. Y. C. & H. R. R. R. Co.,* 71 Hun, 507.)

Vann, J. It is alleged in the complaint that on the 17th of August, 1896, the defendant, while carrying out a contract to erect certain iron work at the foot of Montague street, in the borough of Brooklyn, was guilty of such negligence in handling a heavy girder as to severely injure the plaintiff and cause him to lose one of his legs. The usual issues in such cases were raised by the answer. Upon the first trial the plaintiff had a verdict, but the judgment was reversed by the Appellate Division (41 App. Div. 339). Upon the second trial the same facts were shown in substance, and the court granted a nonsuit upon the ground that the plaintiff, in going upon private property in a condition of disorder without an invitation from the owner, took whatever risk there was, and that there was no evidence of willful or wanton negligence. The Appellate Division affirmed and the plaintiff came here.

When the plaintiff was injured he was employed by the United States government as a weigher in the customs department on the wharf of the Brooklyn Wharf and Warehouse Company

located along the East river front at the foot of Montague street in the borough of Brooklyn. At the same time the defendant was engaged under a contract with said company in constructing a railroad terminus upon the wharf, building a floating bridge and making alterations upon the docks along the river front. The wharf and warehouse company owned the property where the work was going on, which consisted of wharves and warehouses connected with slips and piers where vessels were loaded and unloaded. While the wharves were private property they were used, before the work was commenced, by the public to transact business on the piers and at the warehouses, and to some extent while it was in progress. The wharves, however, were in a condition of great disorder, obstructed by piles of material and by the machinery, tools and appliances used in the work.

The wharf and warehouse company owned the warehouses known as the Pierpont and Mediterranean Stores, which were bounded on the westerly side by wharves, also the property of the company, leading to piers and slips extending into the river; on the northerly side by other wharves and warehouses belonging to other parties; on the easterly side by Furman street and on the southerly side by Montague street leading to the Wall street ferry. The work was going on at a part of a wharf which opened southerly into Montague street. The changes had been in progress for more than two months, and at first the wharf was torn up so as to substantially exclude the public, but when the plaintiff was injured the flooring had been relaid. The wharf, however, was still much obstructed by materials and appliances. From time to time barriers had been erected, consisting of planks laid across barrels, or a rope stretched across the opening, but they were sometimes removed by the defendant's workmen and sometimes carried away by thieves. The defendant was moving a large iron girder about 90 feet long and 10 or 12 feet wide consisting of two parallel beams joined together by parallel crossbars so as to make a solid structure. It weighed 36 tons and, standing on its side, was 10 or 12 feet high and

extended diagonally across the wharf at the opening on Montague street, "blocking the way to the warehouses." One end was so near the southerly storehouse that no one could pass between. On the westerly side was a long pile of stone four or five feet wide and higher than a man's head, but there was an open space of four or five feet between the girder and the stone pile. All the rest of that part of the wharf was obstructed by railroad iron, frogs and stone and "was all littered up." There was no way to pass directly from the storehouses to Montague street except by going through this open space, but there was a regular passageway about eighteen feet wide, under the storehouses, leading to Furman street, which was crossed at a short distance to the south by Montague street. This passageway was used by teams and footmen, and had been used by the plaintiff, but it was narrow and the presence of trucks and traffic made it more or less dangerous for pedestrians. When the accident happened the girder was resting partly upon rollers and partly upon an iron bar connected with a jack by which it had been raised eighteen inches or two feet at one end. Tackle and a winch were used to move the girder toward its destination on the river front, where it was to become part of a floating bridge to take freight from vessels lying in the slips. The method of moving it was to jack it up at one end, place the rollers in position, pull it forward by tackle attached to the other end as far as the rollers would permit and then stop, readjust the rollers and repeat the process. The workmen had been engaged in moving it for several days.

At about four o'clock in the afternoon of August 17th, 1896, the plaintiff finished his work in the Mediterranean Stores, which were adjacent to and northwesterly of the Pierpont Stores, put up his tools and started for home. He wished to reach Montague street and instead of taking the route which passed under the warehouses, he attempted to pass through the narrow space between the girder and the stone pile. At this time many workmen were around the girder, which had been standing still for a few minutes, wait-

ing for orders and in readiness to move it further on at any moment. As the plaintiff was passing between the girder and the stone pile, two or three of the workmen jumped on the girder and pulled the tackle, when in some way, not clearly described by the witnesses, the girder slipped about four feet on the rollers and caught the plaintiff, crushing his leg against the stone pile.

During the entire period of more than two months while the defendant was engaged in this work, the plaintiff passed by it several times every day and was familiar with what was going on. He knew that barriers had been up and down, that heavy work was going on, that everything was in disorder and that the wharf was not yet ready for use by the public. He also knew that many people in fact passed over the wharf to Montague street every day, going by and around the obstructions as he himself was accustomed to. He passed through on the morning of the day he was injured and saw that the wharf was covered with iron rails resting on the stone pile, and with stone, frogs and other materials which he could not describe. He saw the girder, which the workmen had been moving for two days, and noticed that it was on rollers, but did not observe the jack. He passed through four or five times that day. When he was hurt he did not watch the girder particularly, but " was looking out for safety." There was no other place where he could pass except the narrow space between the girder and the pile of stone, unless he took the other route by the passage under the warehouses. The space, four or five feet wide, through which he passed was substantially unobstructed, and many people passed through it every day. A watchman in the employ of the defendant had frequently " warned people not to go down this way," and used to " drive them out," but that was when the wharf was torn up and before the flooring had been restored. They persisted in going, however, " in spite of him even at that time."

Did these facts present a question for the jury either as to the negligence alleged on the part of the defendant, or the

want of negligence on the part of the plaintiff? The wharf was not a public street, but was private property. The defendant was using it by right and the plaintiff by sufferance. The implied invitation from the owners of the wharf to the public to use it as a safe place to walk upon had been impliedly revoked by the work openly carried on and the disturbed condition of things obvious to every observer. If there was still any implied invitation to use the wharf, owing to the fact that use was not prevented, the invitation was necessarily not to use it as a place of safety, but to use it as it obviously was, a place of more or less danger. An invitation by mere sufferance of passage over a place where building operations are going on, carries with it no assurance of safety. All it means is the equivalent of saying, "If you will go through, we do not object, but you must run your own risk of the operations you see in progress." It is not like an invitation to a store to trade, or to a place of amusement, or even to an open field adjacent to a highway and frequented by the public, where there may be an implied duty to give warning of anything dangerous, for the work of moving ponderous bodies is in itself a warning of danger. It did not appear that the girder had ever slid before, or that it was likely to slide, and the expert called by the plaintiff testified, in substance, that the method employed to move it by means of rollers was usual and proper. There was no wanton negligence or willful misconduct on the part of the workmen, and, indeed, no proof that the sliding of the girder was owing to any want of care on their part. There was nothing secret about the operations, but everything was open to the observation of all. There was no concealed danger to require special notice or warning.

Under the circumstances disclosed by the evidence we cannot hold as matter of law, nor could a jury find as matter of fact, that it was the duty of the defendant to put up a barrier and exclude the public altogether, or to warn every one who passed through the narrow space. The contracting company was clothed with the rights of the owner of the property and

was engaged in conducting a lawful business in a lawful way. The situation was a warning to all, and especially to the plaintiff, who knew all about it and had witnessed all the changes as they took place from day to day. There never was any invitation extended, even by implication, so far as the defendant was concerned, but such invitation as there was came from the owners. Mere toleration of the presence of people where heavy machinery is in operation is in no proper sense of the word an invitation to go there, except at their own risk. When one enters a place where work is going on and he knows the nature of the work and the condition of the place, even if many others have been suffered to go there before him, he takes the risk of the operations of the workmen, who cannot reasonably be required to give further notice than the situation itself affords. - Dangerous work in plain sight is notice to a mere licensee. Every one knows that he is liable to meet with danger when passing close by a heavy object weighing many tons, which is being moved by machinery to its position. If operations are suspended for the moment, but the workmen are standing about ready to resume, the passer-by must realize that during working hours and under such circumstances, things may be moving again at any time. When motion begins danger is liable to follow, as all reasonable persons must know. The common experience of mankind is that accidents are liable to happen when large and heavy structures are moved from one point to another. The plaintiff did not ask if the place was safe, or if he could pass through, or take any precaution except that, as he swears, he looked out for safety, which is a mere conclusion. He did not say how he looked out for his safety, or that he did anything to provide for his safety. Knowing that he was in a place of more or less danger, he did nothing so far as appears, and took no precaution except to look ahead. Everybody blessed with eyesight looks ahead when he is walking and the plaintiff's testimony did not amount to anything more than that he looked ahead as he walked. He did not look with reasonable care toward the girder, which was the only source of

danger, as he should have known. He testified that he saw the girder, but would not say that he looked to see " whether they were about to move it," although every thing indicated that movement was imminent. Those ahead of him had slipped through in safety and he took the chances of doing the same. The space was so narrow — some witnesses put it at four feet and others at five — and the pile of stone so large and high that he could not well escape if anything happened to the girder while the workmen were moving it. What was once a passageway, open to use by the public, had been virtually closed for months so that use thereof was impossible, while at the time in question it was so filled up with materials and machinery as to leave only a long, narrow space, bounded on one side by a large pile of stone and on the other by a huge structure of iron ninety feet in length which, as it stood on its side was ten or twelve feet high and resting on the rollers was a warning of danger, even if workmen had not been engaged in moving it. All this the plaintiff knew, yet he turned his back on the safer way out and started through the irregular passage, which was such a picture of insecurity as to be more of a caution to keep out than an invitation to come in. He was not in the employ of the defendant and no contractual relation existed between him and the defendant which owed him no duty except as a member of society. " Dangerous work was in progress " on private property which was in such a condition as to show that the former " public use was interrupted " and he was not injured willfully or wantonly, but by building operations lawfully and openly conducted in the usual way after he had knowingly and unnecessarily " placed himself in a position exposed to obvious danger." He failed to make out a case for the jury either as to negligence of the defendant or as to freedom from negligence on his own part.

The judgment should be affirmed, with costs.

Parker, Ch. J., Gray, Bartlett, Martin, Cullen and Werner, JJ., concur.

Judgment affirmed.