VIVIEN S. W. WORDEN, Claimant, *v.* THE STATE OF NEW YORK, Defendant.  (Claim No. 18103.)

ALTHEA QUICK, as Administratrix, etc., of JULIAN QUICK, Claimant, *v.* THE STATE OF NEW YORK, Defendant.  (Claim No. 18121.)

Court of Claims, October 3, 1929.

*Henry P. Nevins,* for the claimant.

*Hamilton Ward, Attorney-General* [*James Gibson, Second Assistant Attorney-General,* of counsel], for the State of New York.

ACKERSON, P. J.   In June, 1925, Julian Quick and Dr. Vivien S. W. Worden, the above-named claimants, were being treated in the Trudeau Sanatorium at Saranac, N. Y., for tuberculosis. Julian Quick was a young man of thirty years of age, having a wife and one child, and employed by the Johnson Shoe Company at Johnson City, N. Y.   He was earning about $6,000 a year. Dr. Worden was about the same age as Quick and had had quite a varied experience in his profession.   His father for many years had been at Yokohama, Japan.   He was a physician and connected there with the American Consulate.   He was acting as Public Health Officer for the port of Yokohama, and his son, this claimant, assisted him there in that work and had a private practice of his own on shore, whereby he was making some $5,000 or $6,000 per year.   On June 13, 1925, the physicians of the Trudeau Sanatorium had advised both Worden and Quick that the disease in their cases was arrested and that they were ready for their discharge.

There were at the sanatorium at this time studying the disease of tuberculosis, Dr. Radkoff, now of the Health Department of Bulgaria; Dr. Oncheck of Czecho Slovakia, and Dr. Pastor of Porto Rico.   On the 13th of June, 1925, Dr. Radkoff invited Drs. Pastor and Oncheck and these claimants, Dr. Worden and Julian Quick, to accompany him in his Chevrolet sedan on an automobile trip to Montreal.   They left Saranac about twelve-thirty P. M. daylight saving time.   They traveled forty-two miles and came to the scene of the accident in question about one o'clock or one-thirty standard time.   They were traveling over a road which runs from Saranac Lake to Plattsburg, N. Y., which was maintained at that time by the State of New York, under what was known as the "gang system."   The metal part of the road was what was known as bituminous macadam.   The place of the accident was near a locality known as Gougeville and about forty-two miles from their starting point.   It seems there was a depression in the road at this point reaching from the left side of the road out to about the middle thereof.   Upon reaching this depression, the left front wheel of this car went into this hole.   The car immediately swerved to the left onto the shoulder, which at this point was some few inches higher than the metal part of the road. Ditches had been dug through the shoulder about six inches deep from the pavement out to the lateral ditch on the side to drain off water and keep it from collecting on the pavement.   When

the left front wheel of the car went into the depression, near the center of the pavement, the tire from that wheel apparently blew up. Dr. Radkoff, who was driving, immediately lost control of the car and it skidded from that hole over and onto the left shoulder, leaving a very plain mark on the macadam where it skidded, which mark was undoubtedly made by the rim of the wheel. By the time it reached the shoulder, the doctor had evidently straightened up the front wheels so that the car was proceeding in a direction parallel with the road and apparently with the right wheels on the pavement. The instant after it reached the shoulder, the left rear wheel was smashed in one of these lateral ditches, known as " weepers," which extended from the metal part of the road to the lateral ditch along the side.

The car then skidded across to the right-hand side of the road and turned over. In going from the left-hand side of the road to the right-hand side of the road at this point, the car left a clearer and more well-defined mark, apparently made by the broken spokes of this left rear wheel which was smashed when it went into the " weeper " on the left shoulder. These marks in the macadam were much deeper and more pronounced than the marks from the hole in the macadam to the left shoulder. At this time and ever since the car started, Dr. Radkoff was driving the car and Dr. Oncheck was on the front seat with him. Dr. Worden was seated on the left side in the rear seat. Dr. Pastor on the right side in the rear seat and Julian Quick in the center of the rear seat. When the car finally turned over, very severe injuries were inflicted on the face, side and arm of Dr. Worden, and Julian Quick was injured to such an extent that he died very shortly thereafter on that day. Thereafter Dr. Worden and the personal representatives of Julian Quick filed claims against the State, seeking damages upon the theory that the injuries suffered by Dr. Worden and the death of Julian Quick were caused by a defect in the highway at the place of the accident for which the State was and should be held responsible and that it should, therefore, respond to these parties in damages. This court made an award in their favor, holding that this hole in the highway was a defect therein of which the State had notice and that such defect was the proximate cause of this accident. The State appealed from this decision to the Appellate Division. The Appellate Division reversed the decision of the Court of Claims upon the ground that the hole in the metal part of the highway was not the proximate cause of the accident, but that the poor driving, the negligent driving, or careless driving of Dr. Radkoff was the sole proximate cause of the accident. We quote from the opinion of Justice VAN KIRK:

"The shoulder is not constructed as a place on which to travel; irregularities in the surface thereof are not a menace to the traveling public. We may assume that, when the car struck the depression, it swerved, as the court found, and its left wheels went upon the west shoulder of the road. At that time and by that happening neither the car nor any person therein was injured. If the car had then been turned back upon the macadam, there would have been no injury. There is no explanation why it was not so turned back. They say the car was going but twenty-five or thirty miles per hour. Going at this moderate rate of speed, it was easily guided; the driver kept the left wheels of the car on this shoulder, which was but two and one-half feet wide, for a distance of more than one hundred feet, before he struck into this weeper. We think that so driving the car was the distinct negligence which caused the injuries, entirely separate and apart from any negligence of the State, the sole proximate cause of the accident. When the car had swerved and took its course on the shoulder under the control of the driver, no part of the car being injured, the happening at the depression was a closed incident. The driver of the car was not a witness, and there is no suggestion that he was injured, or any more disturbed by the occurrence at the depression than was the plaintiff. No reason is suggested why he did not slow down or turn back on the roadbed. He had plenty of time. Nothing which the State had done or caused kept him from slowing down or from the roadbed." (221 App. Div. 671.)

The case was thereupon sent back to this court by the Appellate Division for a new trial. The new trial has been had. New evidence has been introduced and it seems to us that the questions in this case, which were raised by the Appellate Division and upon which that court deemed it necessary to reverse the decision formerly made herein, have been met and answered. Dr. Radkoff's testimony has been introduced in the case. There can now be no question about what happened when the left wheel of his car struck this depression in the highway, which he says was eight or ten inches deep. As the wheel dropped into that depression he says:

"I felt something break off from the left front wheel and immediately it twisted. As a consequence, I lost control of the car which skidded into the left hand side ditch." (Stenographer's minutes, 6.)

"There was a well-defined deep irregular mark on the left side of the macadam road, starting from the depression in the middle of the road and continuing to the ditch on the left side. In some parts the mark became wider, in others narrower, and here and there it appeared to bifurcate." (Stenographer's minutes, 7.)

We are well satisfied from the evidence in this case that neither

of the front wheels were broken. It is apparent, therefore, from the doctor's testimony that the tire on this left front wheel blew up when it went into this depression and the marks which he speaks of were made by the bare rim scraping upon the macadam, because no such marks could have been made by an inflated tire. Dr. Radkoff is a physician and surgeon of some considerable standing in Bulgaria as he is a member of the Health Department of that country. There is not a scintilla of evidence in this case that would in any way discredit him or any of the other members of this party. With the exception of Julian Quick, they were all educated men and there is nothing in the testimony which even insinuates that any of them were guilty of any indiscretion or misconduct which in any way contributed to this accident. We believe, therefore, that the claimants are fairly entitled to have the court repose full faith and confidence in the testimony of Dr. Radkoff.

He further says: " As a result of the drop of the front left wheel into the hollow of the middle of the road, where it immediately broke, it was absolutely impossible for me to control the car." He does not pretend to say what broke about that wheel, but he says something broke about it, which made it impossible for him to steer that car and that he lost control of it. All of the facts connected with this terrible accident point to the truth of the doctor's testimony.

At that time S. A. Day was the sheriff of Clinton county, that being the county in which this accident happened. About two hours after the accident he was on the scene to investigate this accident in his official capacity. He met Dr. Radkoff there and the doctor gave him a statement. He examined this hole in the road and the marks on the pavement at that time. It does not appear that either party to this controversy knew of this action on the part of the sheriff until long after the first trial, and for that reason his testimony was not taken on the first trial. His evidence is very significant. He is a totally disinterested party and a man who apparently enjoys the confidence of the people of his county. We believe that the court is warranted in giving great credit to his testimony. He says that this hole in the road was very abrupt and about six inches deep and that the edges of the hole were straight down, and he further says that he found marks leading from this hole to the ditch on the left side of the road. (Stenographer's minutes, 52.) He further says that part of the wheel was left on the left-hand side of the road in which he is corroborated by several other witnesses in the case. (Stenographer's minutes, 54.) He further testifies that another accident

had occurred at this hole the week previous to this accident in question. He says a cream truck ran into this hole. The cans were thrown out of the truck and the driver was thrown against the top of the truck and injured. (Stenographer's minutes, 58.)

Mr. Wendell, the engineer who had charge of this road and was responsible for its condition, denies that this accident happened after the cut was made in the pavement from which this depression resulted. Mr. Wendell contradicts the testimony of other disinterested witnesses in this case. Outside of the claimants themselves, he is the most interested witness in this case.

Sheriff Day further testified that the marks on the road between the hole and the left shoulder would indicate that either the tire blew out and the rim made the mark, possibly, or that possibly the wheel might have gone down. (Stenographer's minutes, 65.) He also said that after the car went into the ditch on the left-hand side there seemed to be a larger mark from there to the right-hand side of the road. (Stenographer's minutes, 66.)

One of the very important witnesses in this case was Thomas J. Mead, who conducts a gasoline station practically at the scene of this accident and who saw the accident happen on June 13, 1925. He said it happened about one-thirty P. M. standard time. (Stenographer's minutes, 43.) He said he saw the car coming along in the middle of the road from the direction of Saranac Lake, and he saw it run into this depression, when it "bounced" and "slewed" over to the left side of the metal macadam of the highway, and ran into a small ditch on the side of the road, and then struck another ditch, cut there for water to go through, and shot off in an angle to the right, crossed the road and tipped over. (Stenographer's minutes, 45.)

He says that when it struck in this ditch, to drain off the water, he heard a wheel snap and saw it go to pieces. (Stenographer's minutes, 46.) He said the car was going twenty-five or thirty miles an hour and that he could see the marks of the tire from where it struck the first rut over to the side of the road. (Stenographer's minutes, 50.) He says this depression in the middle of the road was three and one-half to four inches deep and he corroborates Sheriff Day by saying that there was an abrupt raise out of this depression. (Stenographer's minutes, 52.) He says that he had been running his stand there since April twenty-eighth, and that he had observed this rut or depression ever since he had been there and that it had been settling all the time. (Stenographer's minutes, 41, 53.) This, of course, does not coincide with Mr. Wendell's testimony and other employees of the State, who say that this cut was not made in the pavement and this cold

patch was not put on until about May twentieth. He further says that he had seen cars go through this depression and that they would jump to the right or left and would sometimes go fifty or sixty feet before the driver would get control of the car. (Stenographer's minutes, 56.) Dr. Worden is one of the claimants herein and, of course, a very interested witness. He impressed the court, however, as being an intelligent man, fair and honest. He says that before the accident he noticed no unusual speed and all that he remembers about it was that of hitting a bump and then skidding and then there was a crash and he became unconscious. (Stenographer's minutes, 137.)

Mrs. Nettie White, who lives in sight of the scene of the accident, testified that she saw the car coming. She says that she heard three crashes close together; that the first one was when they struck the bump in the road; then they swerved to the left and the wheel broke, and then after that they turned over, and that was the last crash. (Stenographer's minutes, 148, 149.)

John W. Guinup, who also lives right near the scene of the accident, said that at the time he was on the steps of his home and saw the car go into the depression, and he says that he said to himself: " Golley, they got quite a bump." After that, he said that the driver seemed to lose control of the car. He said that the car was coming along the middle of the right-hand side of the road at about thirty miles an hour; that when the car struck in to the end of the hole it swung to the left-hand side of the road; that it then ran along for a short distance and then was thrown to the other side of the road and capsized. (Stenographer's minutes, 207, 208.) He says that the " weeper " or ditch through the shoulder at this point was six inches deep and ten.to twelve inches wide and that it was at that ditch that he saw the broken spokes. He says that it was the left hind wheel that was broken. (Stenographer's minutes, 210, 211.) He said that he had driven an automobile through this depression and that it would throw you up pretty well in the car to such an extent as to pretty nearly stand you up on your feet. He says that he put a straight edge over that hole and measured and found it to be six inches deep. (Stenographer's minutes, 217, 219.)

Roger H. Dutton testified that he lived about one-quarter of a mile from the accident and that he was lying in his dooryard at the time and heard the crash. He said that he looked at this hole in the pavement there on the day of the accident and it was from four and one-half to five inches deep, and that the hole had been there for some time, two weeks anyway. He further says that you could see the marks where the wheel struck this hole and

after it left the hole there on the macadam. He corroborates the other witnesses as to the directions which the car took after it went into this hole. He also related that he had driven over this hole and that when the forward wheel of a car goes into it it swings the car suddenly. He also corroborates Sheriff Day in saying that the edges of this hole were straight down. (Stenographer's minutes, 227–230.)

William Ducatte testified that he lived within one-half mile of the scene of the accident. He said that he was acquainted with this hole in question; that he hit the hole once with his Buick car when he was going thirty miles an hour and got quite a jar and was knocked to one side. He says this happened about two or three weeks before this accident in question. He says that he always remembered that hole after that and never ran into it again.

William O'Connell testified that he was foreman of highway maintenance, and that his beat included the scene of this accident. He said his duties are to repair the road. He says that sometime before this accident they dug into the pavement there and went down about three feet and took out a timber about seven feet long. He says, " we put in some sand or gravel, I forgot which, and then subbased it and leveled it up." He says this hole ran pretty near to the center of the highway and was about two feet wide and that the deepest part of it was two and three-quarters or two and seven-eighths inches deep. He says this cold patch which they put on sank down and left a depression there in the road. (Stenographer's minutes, 270–279.)

Charles F. O'Connell worked for the State on this highway in the spring of 1925. He said he helped put the stone and tar patch on this hole. He said that the first he heard of the accident was about four P. M. on the day it happened and he would not deny that he told his daughter when he first heard of the accident: " I know right where it happened — In that bad hole."

It seems to us. that the only fair and reasonable conclusion to be deduced from the evidence of the witnesses in this case is that Dr. Radkoff was driving his car near the center of the road at about thirty miles an hour; that his left front wheel went into the hole in question, and that the tire on that wheel was there blown up, and that he immediately lost control of the car by reason thereof, and that the car skidded to the left, the bare rim of that left front wheel scraping along on the pavement; that as the car was moving along on the left shoulder it ran into this " weeper " or drain ditch which caused the left rear wheel to go to pieces. It is quite probable that this left rear wheel was weakened or partially broken when it went into the hole in the middle of the road. That as

soon as the left rear wheel went to pieces the car skidded across to the right side of the road and turned over where these claimants received the injuries which caused the death of Julian Quick and the damages to Dr. Worden.

That the State is to blame here in the premises there can be no question. Its employees dug this hole, seven feet long, two feet wide and three feet deep, into this pavement. The filling which they put in was not given time to settle before they put on what they call this cold patch. At the time the cut in the pavement was made it was wet and rainy. They put gravel and sand in the bottom of the hole and then put on their subbase with fine stone on top. They did not wait for it to settle or dry out but put the surface called a " cold patch " over it two or three days after and then, so far as the evidence shows, paid no more attention to it until the happening of this accident. The defect, therefore, in the highway at the point in question which caused this accident the State was wholly to blame for. Its officers and agents made this cut in the highway and then neglected to take any precautionary steps whatever to prevent the settling in the fill that caused the hole. Even after this settling took place and automobiles were having difficulty there for two weeks or more before this accident, nothing was done to remedy the situation although the State was well acquainted with the dangerous condition.

There is no evidence in the case from which we can see that Dr. Radkoff was guilty of any negligence in his driving, but even if there was, there is nothing to show that such negligence could in any way be imputed to these claimants. There seems to be no other disposition, therefore, that can fairly and legally and equitably be made in this matter except to award to these claimants the damages which they have suffered as the result of this defect in this highway for which the State was solely responsible.

We recognize the well-established rule that the State is not an insurer of the safety of its highways under all conditions, and that it can only be held to reasonable care in their construction and maintenance. But, in our judgment, the action of the State in digging this big hole in this highway and then filling it so loosely that it settled leaving an abrupt depression in the middle of the road that was dangerous to automobiles running twenty-five or thirty miles an hour was not the exercise of reasonable care. It was anything but that. It was gross negligence. Such negligence was the proximate cause of the accident in question and that being the case, the State, under the law becomes liable for the damages resulting therefrom.

POTTER and BARRETT, JJ., concur.