EDGAR E. MINER, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 28984.)

DOROTHY HILTON, as Administratrix of the Estate of GORDON E. HILTON, Deceased, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 28985.)

Court of Claims, October 28, 1949.

*Burns F. Barford, Jr.,* and *Edward M. Segal* for Edgar E. Miner, claimant.

*Edward M. Segal* for Dorothy Hilton, as administratrix, claimant.

*Nathaniel L. Goldstein, Attorney-General (Arthur W. Mattson* and *Sidney B. Gordon* of counsel), for defendant.

LOUNSBERRY, P. J. On Sunday, April 11, 1948, at about 6:00 A. M., an automobile operated by the claimant, Edgar E. Miner, in which Gordon E. Hilton was a passenger, while proceeding southerly along New York State Highway Route No. 9, left the highway at a point in front of the Thompson farm, situated

about three miles south of the Route 20 intersection, and collided with a tree located about five feet to the south of the pavement. Miner was severely injured and Hilton, whose administratrix is a claimant herein, was killed. It was daylight, the weather was clear, and the pavement dry. The highway consisted of three lanes, the center one macadam and the other two concrete. The approach to the Thompson house was a straightaway, but beyond the house the road curved left and went downgrade.

Up to a point, the facts and circumstances are undisputed. At 6:00 o'clock the preceding evening Miner was at his brother's home in Albany. He left about 7:30 to visit friends and at about 11:00 that evening went to Glass Lake Hotel, where dancing was in progress and a bar was maintained, and remained there until 3:00 A. M. During this period he admits that he "might have had three beers, approximately". He then went to the DeLuxe Restaurant, Rensselaer, for coffee, returned to the hotel, from whence he took a young woman to her home, remained there about an hour, and then stopped back at the DeLuxe Restaurant where he picked up Hilton. The two proceeded to Miner's brother's house, remained there about an hour and then at about 5:30 A. M. headed for their homes at Valatie. En route they stopped at the 9 & 20 Diner, ordered sandwiches and coffee and promptly fell asleep at the counter. They were awakened by a counterman, consumed the food, again fell asleep, were than invited to leave and did so. Returning to the car, they set off down Route 9 toward the scene of the impending accident.

The problem is what happened next. In his filed claim Miner alleged that he struck a hole in the pavement, which caused the car to proceed out of control into the right shoulder where it encountered a dangerous sandy ridge and an adjacent depression which in turn threw the car out of control and against the tree. On the trial he omitted all mention of any dangerous shoulder and testified instead that he pulled over onto the shoulder to avoid an oncoming tractor-trailer (not mentioned in the claim), and upon returning to the pavement struck the hole and was then precipitated against the tree. He first stated that the approaching tractor-trailer was about three-quarters of the way over on the macadam center lane but later, upon persistent questioning by his counsel, attempted to place it partially over on his right-hand concrete lane. He apparently did not see it until it was within 40 feet of him, although at that point his visibility was at least 350 to 400 feet.

The very existence of the hole is in dispute. The State highway maintenance foreman and four of his crewmen testified that they, or some of them, passed over the road the day before, the day of, and the day after the accident, and that there were no holes in the pavement in front of the Thompson house. Two State troopers who went immediately to the scene of the accident testified that they saw no hole in the vicinity.

On the other hand, Miss Mildred Thompson, who lived in the Thompson house, very positively stated that there was a hole in front of the house, extending crosswise of the west lane of pavement, measuring 4 to 5 feet in length, 5 to 6 inches in width, and 3 to 4 inches in depth; that it had existed for at least two weeks prior to the accident, and that two days before the accident she had seen the highway crew put loose fill, appearing to be sand or gravel, in it. Robert W. Maynard, a friend of Miner, testified that his truck struck a hole in the pavement near the Thompson house some time within eight days prior to the accident. Finally a photograph of the highway just north of the Thompson residence, taken the day following the accident, clearly shows a hole in the south lane. There was no proof that the hole appearing in the photograph was the hole alleged to have caused the accident, but the photograph is significant as to the credibility of the State witnesses.

Upon the whole, we are satisfied as to the existence of the hole. The evidence of Miss Thompson, a disinterested witness, and of Mr. Maynard, is more convincing than that given by the State witnesses, particularly in view of the photograph. We very much doubt that the State highway workers and the troopers made any specific observations with respect to the hole, whereas the claimant's witnesses did so.

The thought occurs, of course, that Miner may have fallen asleep and may simply have run off the road. He had been up all night, had drunk beer, and had already fallen asleep twice. Furthermore, one trooper testified that immediately after the accident Miner told him he fell asleep. Miner insists, however, that he remembers nothing after the accident, but was unconscious for two days. The hospital records indicate that he was unconscious upon admission and remained so for some time, and thereafter was irrational. Hence, the weight of any such statement, if made, is dubious. There is no other direct evidence that he fell asleep.

Be that as it may, we are satisfied that Miner was negligent in several respects and is therefore barred from recovery. It was risky to assume to operate his car after an active night with no

sleep, and particularly knowing that he was sleepy. There is some question in our mind whether the tractor-trailer existed, but even if it did, the more credible evidence is that it was at no time in the south traffic lane. Hence, there was no necessity that Miner drive onto the shoulder. Further, Miner testified that he was familiar with the road and knew exactly where the hole was located. This being so, there was no apparent reason for deliberately steering the car back on the pavement at the precise point where it would encounter the hole. Finally, there is no evidence that Miner reduced his speed, which he says was about forty miles per hour, applied his brakes, or otherwise sought to avoid or minimize the accident. The photographs of the wrecked car testify that he struck the tree with great force.

On his own testimony the picture presented is that he was tired; that he failed to notice the tractor-trailer until nearly upon him; that he unnecessarily swerved without slowing onto the shoulder, swerved back, without reducing speed, onto the pavement and directly toward a known hole in the pavement, struck it, and was then precipitated some 75 to 100 feet against the tree, all apparently without application of brakes. This certainly constituted failure to use reasonable care under the circumstances. (*Thompson* v. *State of New York*, 154 Misc. 707; 4 Warren on Negligence, pp. 194–197.)

We have no evidence as to Hilton's activities up to the time he met Miner at the restaurant in Rensselaer and no information as to whether he knew of Miner's previous activity that night. We also know nothing of his conduct in the car after they left the 9 & 20 Diner. He did know that Miner was sleepy and, were it established that Miner's sleepiness was the cause of the accident, there would be a possibility of imputing negligence to the passenger for consenting to ride with a tired and sleepy driver. As the record actually stands, however, we have concluded that there is insufficient evidence for the imputation of such negligence, and we therefore have found the decedent Hilton to be free from negligence contributing to the accident.

If, therefore, the State was negligent, and its negligence was the cause, or a concurrent cause, of the accident, Hilton's estate is entitled to a recovery. (*Torrey* v. *State of New York*, 266 App. Div. 900; *Laitenberger* v. *State of New York*, 190 Misc. 633.) We think the record establishes such negligence. We have found that the hole had existed in the pavement for at least two weeks. Certainly in that length of time the State had constructive notice of its existence. (*Karl* v. *State of New York*,

279 N. Y. 555; *Laitenberger* v. *State of New York, supra.*) It was large enough to constitute a danger to users of the highway. (*Worden* v. *State of New York,* 134 Misc. 848.) Loose fill, if it was applied, was totally inadequate repair. There were no signs warning of its existence. (*Miller* v. *State of New York,* 231 App. Div. 363; *Wasnick* v. *State of New York,* 183 Misc. 1073.)

While much of Miner's testimony was vacillating and inconsistent, and his conduct negligent, the record seems to establish that he did strike the hole and that his car was thereby thrown out of control. Had the hole not existed, the accident presumably would not have happened. Hence, it was at least a concurrent cause, and the State must respond in damages to the passenger who was not contributorily negligent.

At the time of his death, Hilton was twenty-five years of age, was earning about $44 per week, and was the sole support of his wife, Dorothy Hilton. For his wrongful death, we award damages in the sum of $13,500, together with funeral expenses of $514, with interest thereon from April 11, 1948.

Findings in accordance with the above opinion may be submitted within fifteen days from the date of filing hereof, otherwise this memorandum will be considered the decision herein.

Let judgment be entered accordingly.