OPINION OF THE COURT
Gerard M. Weisberg, J.
This claim is for personal injuries sustained by Douglas Meyer on April 6, 1976, when he fell from a footbridge located on the Stony Brook Campus of the State University of New *998 York (Stony Brook). His father, Robert Meyer, seeks recovery for medical expenses and loss of services.[1]
The facts of the damage-causing accident were described by Douglas Meyer from whose testimony the court finds the following: ”
Douglas Meyer became a student at Stony Brook in January, 1976. On April 6, 1976, at about 1:00 A.M., he was on a bridge located in a wooded area between Kelly Quad and the Earth and Space Sciences Building parking lot. He was coming from the Student Union Building and was going to Kelly Quad where he lived. To get there, Douglas used a dirt path through the woods which led to the footbridge. He customarily used this route and had observed other students doing the same.
Douglas was walking with his friend, Nicholas, and the two were engaged in conversation. The path was illuminated by lights from the parking lot. Douglas and his friend stopped on the footbridge to talk. When Douglas leaned on the bridge railing, it broke, precipitating him into a small creek approximately three feet below. He fell on some rocks and was injured.
A number of photographs of the bridge were put in evidence. The bridge was of a very rudimentary nature and was constructed of tree branches and boards held together with rope. The bridge flooring was made up of pieces of broken board held together by some kind of cord. The railings consisted of tree branches which were approximately three inches in diameter. The bark was worn off and looked deteriorated by weather. Douglas had noticed the condition of the bridge before the accident and had observed that the ends of the railings were rotted. There were no angular supports on the bridge on April 6, but apparently such supports were placed there at a later time.[2]
George Marshall, the Director of Environmental Health and Safety at Stony Brook, testified for the State. He first became aware of the footbridge and the path leading to it in July, 1976, when he examined the accident scene. He knew of other *999 unpaved paths which were used by students, but said that he had not been aware of the path where the incident occurred, and therefore never recommended that signs be posted against using it. He claimed that his jurisdiction extended only to the paved paths on campus.
To Mr. Marshall’s knowledge, the bridge was not built by the State, but he said that it could have been built by someone in the maintenance department with boy scout experience. The witness was qualified as an expert on bridges and testified that there is a code applying to their construction. The railings on the bridge in question did not conform to safety standards prescribed by the code. Marshall made a report on the condition which he found in July of 1976 in which he recommended either that the bridge be torn down, or that a substantial bridge be constructed with paving and lighting.
Upon rebuttal, both sides placed in evidence certain excerpts of an examination before trial of Ronald W. Siegel, Assistant to the Vice-President of Stony Brook. Siegel was familiar with the footbridge and thought that it had been there for more than two years. He did not know exactly when the bridge was constructed. When asked what his responsibility for the bridge was, he said that it was difficult to answer, since he also claimed that he did not maintain wooded areas. The State’s defense was thus predicated on the purported ignorance and/or lack of responsibility of these Stony Brook officials.
LIABILITY
Claimants seek to fasten liability on the State by virtue of its status as the owner of the premises. The State denies responsibility for claimant’s injuries on the theory that it did not construct or maintain the bridge, and additionally, that it did not have notice of the defective condition.
The duty of care, which the owner of land owes to persons coming upon it, was set forth in Smith v Arbaugh’s Rest. (469 F2d 97, 100) as follows: "A landowner must act as a reasonable man in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk.” The court need not determine claimant’s status as invitee, licensee or trespasser. There is now a single standard of care, determined by the likelihood of claimant’s presence at the particular time and *1000 place of the injury, and the foreseeability of harm. (Basso v Miller, 40 NY2d 233.)
The footbridge from which Douglas Meyer fell was a dangerous instrumentality. It posed a foreseeable risk of harm to persons traveling over it. The bridge was a crude, makeshift structure to begin with, and had become even more dangerous by virtue of its deterioration. The State’s witness, Mr. Marshall, testified explicitly that it did not conform to recognized standards of safety.
Concerning the likelihood of claimant’s presence on the bridge, it appears from a map of the Stony Brook campus which was placed in evidence, that the campus contains numerous areas which have been left more or less in their natural state. The various facilities and buildings are connected by paved walkways and roads and there was testimony in the case that Douglas Meyer could have reached his destination by using these roads. He chose instead to take an alternate route through the woods. This was an entirely foreseeable circumstance. As the court stated in Fitzsimmons v State of New York at Stonybrook, 42 AD2d 636, 637, affd 34 NY2d 739: "The State should have known of the propensities of students and others to take short cuts and that they do not always follow a prescribed path to a particular destination. (Mayer v. Temple Props., 307 N.Y. 559, 563.)”
Indeed, the State’s witness, Mr. Marshall, testified that he was aware of other unpaved paths used by students from one part of the university to another. The foreseeability that students would use these paths gave rise to a duty to use reasonable care with regard to all of them. At the very least, the State should have conducted an inspection of this wooded area. The existence and condition of the bridge would have been disclosed by such a procedure. (See Schanberg v State of New York, 53 Misc 2d 116, 118, revd on other grounds 30 AD2d 712.) The State’s purported ignorance of the condition, far from being a defense to the action, constituted a breach of its duty of care. Where there is a failure to inspect, constructive notice need not be proved. (Serbalik v State of New York, 204 Misc 2, affd 283 App Div 1136.) It also appears that Mr. Siegel, the Assistant to the Vice-President of Stony Brook, was aware of the existence of the bridge and stated that he thought it had existed for more than two years. His knowledge of the bridge, and its obviously dangerous condition, provided ample notice to the State. (Miner v State of New
*1001 York, 196 Misc 752, affd 277 App Div 921; Camuglia v State of New York, 197 Misc 180.)
The defendant contends however that it would be unreasonable and unduly burdensome to require the State University to take steps to prevent accidents from occurring in the "natural areas of the campus”, relying upon the following language from Scurti v City of New York (40 NY2d 433, 442): "In this connection it is important to note that the elimination of the immunity conferred by prior law should not pose an unreasonable burden on the use of the property since all that is now required is the exercise of reasonable care under the circumstances (Basso v Miller, 40 NY2d 233, 241, supra). The defendant can always show that it would have been unduly burdensome to have done more (see 2 Harper and James, Torts, p 1437).”
The State is clearly not an insurer against accidents resulting from the natural character of an area such as a park. (See Schumm v State of New York, 12 AD2d 682.) However, the bridge in this case was not a natural phenomenon. It would not have been unduly burdensome to either keep it in repair or tear it down. Indeed, the State’s witness, Mr. Marshall, made precisely those recommendations in his report.
The court therefore concludes that the State was negligent and that such negligence was the proximate cause of Douglas Meyer’s injury. Accordingly, the State is liable for that portion of his injuries as will be indicated below.
CULPABLE CONDUCT BY CLAIMANT
Since this cause of action accrued after September 1, 1975, the provisions of CPLR article 14-A are applicable to this claim (CPLR 1413). The doctrine of comparative negligence is embodied in CPLR 1411 which provides as follows: "In any action to recover damages for personal injury, injury to property, or wrongful death, the culpable conduct attributable to the claimant or to the decedent, including contributory negligence or assumption of risk, shall not bar recovery, but the amount of damages otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the claimant or decedent bears to the culpable conduct which caused the damages.”
The term "culpable conduct” is central to the new statutory scheme. It specifically includes both contributory negligence and assumption of risk, as well as certain products liability defenses. (See 1975 Report of NY Judicial Conference on the *1002 CPLR, McKinney’s 1975 Session Laws of NY, p 1479 et seq.). Culpable conduct must be "pleaded and proved by the party asserting the defense.” (CPLR 1412.)
In the present case, the State maintains that Douglas Meyer was contributorily negligent in his use of the bridge and that he assumed the risk of harm. Claimants correctly point out that although defendant pleaded contributory negligence in its answer, it did not affirmatively plead assumption of risk, and raised the issue for the first time in its posttrial memorandum of law. The question is whether under these circumstances the court may consider all of the culpable conduct which is supported by the evidence at trial, even though some of it might be classified under assumption of risk.
In this regard the Judicial Conference Report on the CPLR, (supra, pp 1479, 1484) stated as follows: "The statute [Article 14-A] is also consistent with the position taken by the New York courts, which have found that 'there is a borderline where the concept of contributory negligence merges almost imperceptibly into that of acceptance of risk * * * Very often the difference is chiefly one of terminology.’ McFarlane v. City of Niagara Falls, 247 N.Y. 340, 349, 160 N.E. 391, 57 A.L.R. 1 (1928) (Cardozo).”
The court is loathe to perpetuate a distinction which is to some degree superseded by the new statutory scheme, and which was never particularly clear. The main consideration is that the plaintiff be given adequate notice of what conduct will be relied upon in mitigation of damages. While it would have been better practice for the State to use the term "culpable conduct” in its answer, the court is satisfied that the State’s allegation of contributory negligence, as explained in its bill of particulars, was sufficient to put claimant on notice of the conduct which would be relied upon in mitigation of damages. The proof at trial did not materially diverge from the allegations in defendant’s pleadings, except in respect to certain proof of Douglas Meyer’s knowledge of the defective condition of the bridge. This evidence was developed from the lips of claimant himself and can hardly have been a source of surprise. Indeed, this case presents the type of factual situation in which the distinction between the two doctrines was most apt to become blurred. Accordingly, the court will consider all culpable conduct attributable to claimant in mitigation of damages.
One aspect of claimant’s culpability stems from his percep *1003 tion prior to the accident that the bridge was in a deteriorated condition and that in particular the ends of the bridge railings were rotted. The court has observed from the photographs of the bridge which were placed in evidence that the bridge was a clear and obvious hazard. Its appearance should have served as a warning against use to any reasonable person (Downes v Elmira Bridge Co., 179 NY 136; Olsen v State of New York, 30 AD2d 759), including one of Douglas’ age and experience. (McNally v Addis, 65 Misc 2d 204; Rodford v Sample, 30 AD2d 588.) As stated in Prosser, Torts ([4th ed], p 424): "Contributory negligence may consist not only in a failure to discover or appreciate a risk which would be apparent to a reasonable man, or an inadvertent mistake in dealing with it, but also in an intentional exposure to a danger of which the plaintiff is aware.”
Additionally, the bridge should not have been used as a way station for conversation. It was patently unfit for this purpose. In general, a bridge is designed for travel over it, and where it is otherwise safe for this purpose, it may be contributory negligence to use it for any other purpose. (McCann v City of New York, 270 App Div 1040.) Considering Douglas’ knowledge of the rotted condition of the railings, it was also negligent for him to stop and lean against one of them. Although it is not contributory negligence per se to lean on a bridge railing (Langlois v City of Cohoes, 58 Hun 226), in this case Douglas knew of the defective condition and failed to exercise reasonable care to protect himself. This constituted "culpable conduct” as that term is used in CPLR 1411.
By reason of the foregoing, the court concludes that the State and the claimant were equally at fault in causing the accident. Accordingly, the State shall be liable for one half of claimant’s damages.
DAMAGES
Douglas Meyer was treated at St. Charles Hospital in Port Jefferson, Long Island on April 6, 1976. He was seen in the emergency room and a number of X rays were taken. At that time he complained of injury to his lower back and left elbow. Douglas is left-handed. Subsequently, on April 9, 1976, he was examined by Dr. N. Mavani and Dr. J. Nathenas of the Kings Highway Medical Group. Dr. Nathenas’ notes indicate localized tenderness and swelling over the lateral aspect of the left elbow. Douglas was diagnosed as having a contusion of the left elbow with mild synovitis. He was given a compression dress *1004 ing immobilizing the elbow and a sling. No fracture was indicated. Douglas was then treated by Dr. James W. G. Murray on April 20 and April 30 of 1976, at which time additional X rays and examinations were. made. Subsequently, on August 19, 1976, Douglas was again seen by Dr. Nathenas who indicates that, upon physical examination, Douglas was completely normal, and had no complaints, pain or tenderness.
Douglas wore a sling for approximately 10 days to 2 weeks. He stated that prior to his last visit to the doctor, his elbow did not feel normal, that he had pain on picking up things, but that he was able to flex his elbow. He noted in particular that his elbow pained him when he went bowling or engaged in other sports and also when he was driving long distances. He stated that his back injury no longer pained him. No claim was made for permanent injuries.
Douglas was not employed at the time of this accident. He was a student at the university. There are therefore no lost earnings to be considered. It was also contended that Douglas failed a course in anthropology because of his injury. The court finds however that claimant failed to sustain his burden of proving a sufficient causal connection between the accident and this academic failure to warrant an award for this item.
The court finds that Douglas Meyer sustained damages for personal injury and pain and suffering in the amount of $1,500. As previously indicated, the State is liable for 50% of that sum.
DERIVATIVE CLAIMS
The court further finds that claimant, Robert Meyer, Douglas’ father, incurred damages in the form of medical expenses as follows: treatment at St. Charles Hospital, $165; treatment by Dr. Murray, $202; and treatment by Kings Highway Medical Group, $170 — the total amount of damages in the form of medical expenses being $537.
The court must now decide whether Douglas Meyer’s culpable conduct is to be imputed to his father so as to diminish or bar the father’s derivative claims. Since the enactment of CPLR article 14-A, no court of this State appears to have addressed this question.
Although CPLR 1411 does not specifically mention derivative claims, it does refer to "any action to recover damages for personal injury”. Section 37-a of the General Construction *1005 Law which defines "personal injury” has been construed to include derivative actions. (Bailey v Roat, 178 Misc 870; Constantinides v Manhattan Tr. Co., 264 App Div 147.)
Although a number of States have considered this question, Wisconsin in particular has litigated the issue fully since the adoption of its comparative negligence statute in 1931. (Wis Stat Ann, § 895.045.) Wisconsin’s version of comparative negligence differs from New York’s in that a Wisconsin plaintiff recovers nothing if his negligence is 50% or above. The rule in Wisconsin, prior to the adoption of comparative negligence, was that contributory negligence by a child or spouse constituted a bar to any derivative claims for medical expenses, loss of services or loss of consortium. (Callies v Reliance Laundry Co., 188 Wis 376.) This rule has been frequently criticized (see 1 Harper and James, Law of Torts, p 640), but is nevertheless followed in New York and most other jurisdictions. (Maxson v Tomek, 244 App Div 604; Reilly v Rawleigh, 245 App Div 190; McNally v Addis, 65 Misc 2d 204, supra; see Ann. 21 ALR3d 469; contra, Handeland v Brown, 216 NW2d 574 [Iowa] which held that where a child’s contributory negligence was not the sole proximate cause of the injury, it did not constitute a defense to the father’s action for medical expenses and loss of services.)
Following the adoption of comparative negligence, the Wisconsin Supreme Court held in Hansberry v Dunn (230 Wis 626), that where plaintiff’s wife was 45% negligent in an automobile accident in which she was driving her husband’s car, the husband could nevertheless recover the full amount of his derivative claim for the wife’s medical expenses. The court subsequently repudiated this doctrine in Schwandt v Milwaukee Elec. Ry. Transp. Co. (244 Wis 251), in which the derivative claim of a father was reduced by 40% because of his daughter’s contributory negligence. The rule was refined further in Schwartz v City of Milwaukee, 54 Wis 2d 286, 195 NW2d 480 in which a distinction was drawn between (1) derivative claims for collateral damages such as medical expenses, and (2) for loss of services or consortium. The former were held subject to being reduced or barred by the negligence of the primary plaintiff, while the latter were not. The court reasoned that claims for medical expenses incurred by a parent or spouse were actually parts of the primary plaintiff’s damages which were simply assigned to the secondary plaintiff by operation of law. Claims for loss of services or consor-
*1006 tium were, on the contrary, independent of the personal injury claim. Interestingly enough, the court cited the New York cases of Maxson v Tomek (supra) and Friedman v Beck (250 App Div 87) as not recognizing this distinction.
The Schwartz rule was short lived however. In White v Lunder (66 Wis 2d 563, 574) and Victorson v Milwaukee & Suburban Transp. Corp. (70 Wis 2d 336), the court adopted what is presently the rule which was stated in White as follows: "We deem it appropriate to declare, for the purpose of applying our comparative negligence statute, that both the causes of action for medical expenses and loss of consortium shall be deemed derivative; and that the causal negligence of the injured spouse shall bar or limit the recovery of the claiming spouse pursuant to the terms of the comparative negligence statute.”
The court has considered all of the arguments put forward in the succession of Wisconsin cases discussed above, and has concluded that the rule as expressed in the White case is both logical and consistent with New York’s traditional view of derivative claims. It is also significant that CPLR 1411 requires that in wrongful death actions, the percentage of the decedent’s culpable conduct must be imputed to his beneficiaries. It is therefore apparent that the draftsmen of CPLR 1411 did not feel that the adoption of pure comparative negligence necessarily entailed the abolition of imputed contributory fault. In this connection the Judicial Conference Report on the CPLR (McKinney’s Session Laws of NY, 1975, p 1486) stated: "In applying this article, not only the culpable conduct of a claimant or decedent is to be considered, but also any culpable conduct which is legally attributable to him though actually committed or performed by another.”
We therefore conclude that claimant Robert Meyer’s claim for medical expenses must be reduced pro rata by virtue of the 50% culpable conduct of his son. No award is made for loss of services for the reason that Robert Meyer failed to establish what services were actually lost by reason of the injury and the value thereof. (Muller v Hillenbrand, 179 App Div 831, revd on other grounds 227 NY 448, rearg den 228 NY 557; Coish v State of New York, 23 Misc 2d 117.)
Accordingly, Douglas Meyer is awarded the sum of $750 and Robert Meyer is awarded the sum of $268.50.

. At the time this claim was filed, Douglas was a minor. He has since reached his majority. Accordingly, the title of these proceedings was amended at trial.

. This evidence was not admitted to show negligence by the defendant, but rather to explain the appearance of the bridge in the photographs. (See Canudo, Evidence Laws of New York, p 37; Getty v Town of Hamlin, 127 NY 636.)