EUGENE PEEK, and Also EUGENE PEEK, as Administrator of the Estate of LOUISE PEEK, Deceased, Claimant, *v.* THE STATE OF NEW YORK, Defendant.

Claims Nos. 18698 and 18699.

Court of Claims, September 6, 1930.

*Frederic C. Barns*, for the claimant.

*Hamilton Ward, Attorney-General [J. D. Wilson, Deputy Assistant Attorney-General,* of counsel], for the State of New York.

RYAN, J. These claims were tried together. The first was filed to recover damages for injury to Eugene Peek's automobile; the second to recover damages for causing the death of Louise Peek, claimant's intestate, a passenger in said automobile. The accident occurred August 5, 1928, between nine-thirty and ten o'clock at night, at a point on State Highway No. 5325, between Stittville and Marcy Station, said highway running generally north and south. The point of the accident was on a curve where the road descended at a six per cent grade, bearing to the east. Eugene Peek was driving generally in a southerly direction and was, therefore, properly on the outside of the curve. The highway was an eighteen-foot bituminous top previously water bound. On the curve the width increased to between twenty and one-half feet and twenty-two feet. Being a crowned road it appears that the edges of the hard surface were lower than the center of the highway, but at the point of accident the highway was nearly level, the outside edge of the hard surface gradually increasing in elevation around the curve. There was a shoulder of softer material sloping from the pavement towards the ditch which ran alongside the road. The

shoulder varied from three feet seven inches in width at a point well north of the accident to a width of over six feet farther down the hill. The highway was maintained by the State under the patrol system.

Claimant bases his charge of negligence upon three distinct conditions maintained by the State which he alleges to be faulty. They are, *first*, the construction and maintenance of the highway itself in such a manner that the outside of the curve was not banked so as to be higher than the center and the inside; *second*, the failure of the State to maintain guard rails around the curve. The exhibits in the case, both the maps and the photographs, were made after the State had actually put in a line of guard posts, some eleven in number, between the point of beginning of the down grade and the point of the accident. As to the first contention of the claimant, it appears that the improved or hardened surface of the road at the time of the accident was in good condition and perfectly safe for travel. As to the second contention, it would be only hazarding a guess to say that if the guard posts had been present on August 5, 1928, they would have prevented the accident.

Claimant's *third* contention, however, presents a more serious aspect. There existed along the edge of the macadam a rut, apparently caused by the action of rains following the breaking away of the edge by wheels of wagons and automobiles as they took the outside of the road to descend around the curve. The extent, width and depth of the rut is variously described by the different witnesses. It was from four to seven inches wide and from four to seven inches deep. It extended from a point at the top of the grade to a point near the apex of the curve where it turned abruptly off into the ditch, some 125 feet. However the witnesses may disagree in describing it, the rut certainly existed, and the State's patrolman, Moulton, as well as the resident engineer, Stewart, knew of its existence. Stewart stated that he saw the rut " a week prior and a week subsequent to the accident." Moulton, the light maintenance foreman in charge of the repair patrol, was questioned, both by counsel for the State and counsel for the claimant, and by the judges, as to the exact time the rut was repaired last prior to the accident. He had no clear recollection of the date it was last repaired. He did testify that it was repaired in October, 1927, and April, 1928.

When the highway became dangerous through wear and the action of the elements it was the duty of the State to repair it and put it in reasonably safe condition. (*Sporborg* v. *State*, 226 App. Div. 113; *Best* v. *State*, 203 id. 339; *Kirchner* v. *State*, 223 id. 543.)

The only witness to the accident who was called to testify was

the claimant. His story of the accident follows: Claimant was returning from a visit to Piseco lake. He was driving a Hudson sedan, 1927 model, which had been driven only 2,000 miles and was equipped with four-wheel brakes, besides an emergency brake, with new tires of good tread, non-skid on all four wheels, with good lights. As he began to descend the grade he was running along from twelve to fourteen miles an hour.

" I slowed down to about 8 or 10. All at once the wheel dropped off into the rut, the back wheel, and almost at the same time the front wheel went into the rut. Q. Did you feel the jolt? A. Yes, as I come down to the end of this rut it snatched the wheel away and started for the ditch. As it did that, I applied the brakes heavy and the hind wheels took it around and the next thing I knew I was in the ditch."

The car turned over, the rear end swung around, the front wheel was held in the rut until it went into the ditch. The hind wheel got in the rut first. They went in almost at the same time.

Again on cross-examination the claimant testified that he was going twelve to fifteen miles per hour.

" Q. When did you slacken speed? A. As I started to coast down the grade. Q. Were you coasting down the grade? A. No, I wasn't coasting. Q. I understood you to say you were coasting down the grade? A. No, I wasn't coasting."

Claimant continued, testifying that he was in high gear, reduced his speed to less than fifteen miles an hour; that he was not going over ten miles per hour; that he gradually put on the brake and tried to get out of the rut; that he was going maybe twelve miles an hour when he dropped in the rut; that, although he put on the brake, he was not able to stop the car; that he did not travel more than twelve feet after he dropped into the rut before he hit the ditch; that he did not put on the emergency brake; that he did not put the brakes on very heavy; that when the front end went in the ditch he put the brakes on strong; that the hind end of the car then went around twelve or fifteen feet.

Claimant's car after the accident was headed up the hill, lying on its left end side against the embankment of the ditch with the wheels up in the air; the body was completely wrecked, the upper part thereof crushed in; steering wheel was gone; both fenders jammed on the left-hand side of the car, the front fender and the back fender; the running board was jammed; the windows were all smashed; the rim on the right front wheel was torn loose from the spokes in places; the rear tire was flat.

It is inconceivable that an automobile of the quality and in the condition of the Peek Hudson sedan traveling at the rate

testified to, if properly under control, could not have been stopped before it landed in the ditch or that the impact from striking the side of the ditch in the manner described was sufficient to have damaged the automobile to the extent described. Either the automobile was moving much more rapidly or it was improperly handled. Under all the circumstances a driver exercising reasonable care and control should have stopped his automobile before it went into the ditch. However, had the rut not existed the accident would not have occurred and the negligence of the driver cannot be attributed to his passenger, Louise Peek. (*Worden* v. *State*, 221 App. Div. 671.)

The claim of Eugene Peek individually should be dismissed. There should be an award in favor of Eugene Peek, as administrator of the estate of Louise Peek, deceased, in the amount of $2,000.

ACKERSON and POTTER, JJ., concur.