CHRISTOPHER A. THOMPSON, as Administrator, etc., of WILHELMINA C. THOMPSON, Deceased, Claimant, *v.* THE STATE OF NEW YORK, Defendant.

(Claim No. 22205.)

CHRISTOPHER A. THOMPSON, Claimant, *v.* THE STATE OF NEW YORK, Defendant.

(Claim No. 22206.)

Court of Claims, March 8, 1935.

*Augustus Thibaudeau,* for the claimants.

*John J. Bennett, Jr., Attorney-General* [*James Gibson* and *John L. Campbell, Assistant Attorneys-General,* of counsel], for the State of New York.

ACKERSON, J. The above-entitled claims were tried together. They seek to recover damages from the State by reason of its alleged negligence in the construction and maintenance of a State highway in Niagara county known as the Niagara Falls boulevard.

It appears from the evidence presented on the trial that on October 30, 1931, the said claimant, Christopher A. Thompson, was proceeding over said highway in an easterly direction in his Pontiac automobile. The said Wilhelmina C. Thompson, wife of said Christopher A. Thompson, was in the automobile with him. They both sat on the front seat. Mr. Thompson was driving and his wife sat at his right. It was between the hours of six and seven o'clock in the evening and quite dark. The headlights on the automobile were lighted. Mr. and Mrs. Thompson were both over sixty years of age and he was an experienced driver, having driven an automobile for sixteen or seventeen years. Mr. Thompson says they were proceeding at a speed of about eighteen miles per hour.

They were traveling easterly on the newly-constructed concrete pavement of said boulevard, which is forty feet wide. Just easterly of the junction of the boulevard and what is known as the Sy road this concrete pavement ends and the boulevard continues on with an old brick pavement seventeen feet wide. The center line of the brick pavement connects with the center line of the concrete pavement where they join just easterly of the Sy road. Extending easterly from the end of the concrete pavement on either side of the brick pavement is a V-shaped strip of bituminous macadam designed to connect up the two pavements. These V-shaped strips are eleven and one-half feet wide at the concrete and extend along the brick pavement on either side thereof tapering to a point. Each of said strips is 103 feet long.

It is contended by the claimant and fairly well established by the evidence that on the night in question there was a hole or series of holes and ruts in the southerly shoulder of the brick pavement and just easterly of the said V-shaped strip of bituminous macadam. These were caused, apparently, by vehicles approaching from the west on the wider pavement, as was this claimant, and running on to the shoulder of the brick pavement in transferring from the wide concrete to the comparatively narrow brick.

There was considerable testimony presented showing that prior accidents had occurred at this point by reason of vehicles running

into these holes or ruts on this shoulder of the brick pavement. The State knew of this condition there existing for months prior to this accident and had frequently filled up these holes with dirt or slag or stone.

The representative of the State who had charge of this road was asked these questions about the point where the accident happened: " Q. It is a pretty bad and dangerous spot? A. Yes. Q. You are apt to have accidents there at any time? A. Yes."

As Mr. Thompson on the night of the accident approached this spot he saw an automobile with very bright lights approaching him from the east very rapidly in the middle of the brick pavement. Thereupon Mr. Thompson pulled his car to the right in order to pass the oncoming automobile, and just as it went by him one or both of the right wheels of his car dropped into a hole on the shoulder of the brick pavement just east of the easterly end of the V-shaped strip of bituminous macadam. At this moment, Mr. Thompson testified, the steering wheel was jerked out of his hands and he lost control of the car. He did not put on his brakes and make any effort to stop the car and he did not regain his hold on the steering wheel. The car after leaving the pavement and going into a hole or rut on the shoulder proceeded on easterly for over 190 feet, passed over to the northerly side of the brick pavement, turned partially around and collided with a power line pole on the northerly side of the highway. It collided with such force as to ruin the automobile, break the pole, which was fourteen or fifteen inches in diameter, in two places and splinter or split it for a distance of twenty feet. Both Mr. and Mrs. Thompson were very seriously injured. Mrs. Thompson had a fracture of the skull and died as a result of her injuries soon after the accident.

The accident was caused by the ruts and holes on the shoulder of the brick pavement together with the careless and negligent driving of the claimant Thompson.

There was not any defect in either the concrete or the brick pavement, and if the automobile had remained on the pavement, which is the part of the highway prepared for traffic, the accident would not have happened.

" The shoulder of the highway is not constructed to travel on, and irregularities in the shoulder are not defects in the highway or a menace to the traveling public." (As this court held in the case of *Gould* v. *State*, 130 Misc. 776; and as the Appellate Division held in *Worden* v. *State*, 221 App. Div. 671.)

Also, in *Flansburg* v. *Town of Elbridge* (205 N. Y. 423, at p. 430) Judge COLLIN used this language: " The town is not responsible for the injuries sustained by the plaintiff consequent upon his

straying from the adequate and suitable roadway prepared for travelers."

But this rule, if strictly adhered to, might work a serious injustice in some cases. In these days of fast automobile traffic, a careful driver, through no fault of his own, is sometimes forced onto the shoulder of the road by a careless and negligent driver who crowds him off from the pavement, or a driver by accident in the night time might inadvertently drive onto the shoulder. It would seem, therefore, that the shoulder of the road, while it is not made to travel on, should be in such condition that it could be resorted to in an emergency without danger to life and limb. Of course, a driver who finds himself suddenly compelled to go onto the shoulder, or who finds that he has passed onto the shoulder inadvertently, must immediately bring his car under control and move with such care and caution as the situation demands.

Even in the old days of horses and wagons, we find Justice WOODWARD writing for the Appellate Division, Second Department, as follows: "There is no merit in the suggestion made by the defendant that it is not liable, because the stones on which the wagon struck were outside of the traveled portion of the highway. The traveled portion of a highway is not confined to the part actually used the greater portion of the time by vehicles, but is that part which is held open to the public as a highway, and which is used in passing other teams. There can be no question as to the duty of the defendant to keep such open way, over which it has assumed to exercise control, in a reasonably safe condition for travel, taking into account the circumstances of the road and its surroundings." (*Newell* v. *Stony Point*, 59 App. Div. 237.)

Also in the claim of *Peek* v. *State* (137 Misc. 840) this court made an award for the damages caused by the death of a passenger in an automobile which was wrecked by slipping off from the pavement into a rut on the shoulder of the road.

And so here Mrs. Thompson was a passenger, had nothing to do with operating the car and cannot be charged with the contributory negligence which her husband seems to be guilty of.

Mr. Thompson as he approached the scene of this accident passed three warning signs. One said, "Warning, Cross Roads." Another said, "Concrete Pavement Ends." And still another said, "Caution, Narrow Pavement." Then in addition he observed the narrow pavement ahead of him and saw the automobile approaching in the middle of it at a high rate of speed when it was 600 feet away. He should have, of course, under those circumstances, immediately brought his car under absolute control and held himself in readiness to stop at a moment's notice if he found

it necessary to do so. Instead he also apparently maintained a high rate of speed. He says he was going only eighteen miles per hour, but in view of what happened he must have been greatly mistaken when he gave that testimony. It is impossible to believe that an automobile in the hands of an experienced driver like Mr. Thompson, going only eighteen miles per hour, could become absolutely unmanageable by reason of such a depression in the shoulder as was encountered here and tear down the road for nearly 200 feet and work the havoc which this automobile did in breaking off this large pole fourteen or fifteen inches in diameter, killing one of its occupants and very seriously injuring the other, and demolishing itself if it was moving only eighteen miles per hour when it went into the rut.

When the steering wheel was jerked out of his hands, he never got hold of it again, never put on the brakes, never did anything to stop the wild course of this machine to destruction. This is a picture that tells the story of a high rate of speed — a speed that made the automobile absolutely uncontrollable in the hands of even an experienced driver like Mr. Thompson when it received the bump or jolt which was administered to it by this hole in the shoulder. And yet, if claimants' witnesses are to be believed, other automobiles were running through this hole every day, many of them without accident, going at various rates of speed from forty to sixty miles per hour.

A similar comment might be made here to that made by Judge RYAN in the *Peek* case where he said: " It is inconceivable that an automobile of the quality and in the condition of the Peek Hudson sedan traveling at the rate testified to, if properly under control, could not have been stopped before it landed in the ditch, or that the impact from striking the side of the ditch in the manner described was sufficient to have damaged the automobile to the extent described. Either the automobile was moving much more rapidly or it was improperly handled. Under all the circumstances, a driver exercising reasonable care and control should have stopped his automobile before it went into the ditch. However, had the rut not existed, the accident would not have occurred and the negligence of the driver cannot be attributed to his passenger." (*Peek* v. *State*, 137 Misc. 840.)

We believe that similarity of the circumstances upon which the claims before us are based to those upon which the Peek claims were based compels us to make a similar decision here to that which we made in the Peek claims.

It is true that the evidence as to the existence of these holes or ruts on this shoulder at the precise time of this accident is not as clear and explicit as could be wished.

A few days after the accident the claimants' enterprising attorney, accompanied by a civil engineer and a photographer, visited the scene of this accident. Before they arrived the State authorities had been there apparently and repaired the shoulder and filled up what holes or ruts they could find there with some kind of earth. Met with this situation, the attorney and his assistants took a shovel and proceeded to excavate a hole, then photographed it, and presented the photograph to the court as a picture of the hole which caused the accident. Attention is called to this testimony because it must be clearly understood that we are not charging the State with negligence by reason of it but because of the other testimony in the record concerning the condition of this shoulder including the admission of the agent of the State as to its condition which has been referred to above.

The primary cause of this accident was the condition of the shoulder of the road at the point in question on the night of the accident. This condition, however, could have been overcome but for the careless and negligent driving of the claimant Christopher A. Thompson before he encountered the hole in the shoulder and his utter lack of driving after that. The broken spring is of little importance in the determination of this matter because it is conceded that no effort was made to steer the car after the spring was broken.

We conclude, therefore, that the claim of Christopher A. Thompson, No. 22206, must be dismissed and that an award must be made in the claim of Christopher A. Thompson, as administrator of the goods and chattels of Wilhelmina C. Thompson, deceased, No. 22205, in the sum of $2,858.25, with interest from November 11, 1931, the date of the death of said decedent.

Findings may be prepared herein in accordance with this opinion.

BARRETT, J., concurs.