Anna McCauley, as Executrix of Roderick McCauley, Appellant, *v.* State of New York, Respondent. (Claim No. 32614.)

Gordon Deshaw, as Administrator of the Estate of Wanda Deshaw, Deceased, Appellant, *v.* State of New York, Respondent. (Claim No. 32615.)

Henry S. Salamy et al., as Administrators of the Estate of Joseph H. Salamy, Deceased, Appellants, *v.* State of New York, Respondent. (Claim No. 32628.)

Third Department, January 12, 1960.

*Adam R. Palmer* for Anna McCauley, appellant.

*Perrin & Daniels* for Gordon Deshaw, appellant.

*Hayward H. Plumadore* for Henry S. Salamy and another, appellants.

*Bliss & Bouck* of counsel to the appellants (*F. Walter Bliss* on the argument).

*Louis J. Lefkowitz, Attorney-General* (*Paxton Blair* of counsel), for respondent.

*Per Curiam.* On March 3, 1954 a Ford automobile driven by Roderick McCauley in an easterly direction on Route 3 crossed over to its left side of the road near the approach to a bridge spanning the Raquette, and passing between a vacant space some 10 feet wide in the protective guardposts on the left side of the road, plunged down a bank and into the river.

The driver McCauley and two of the passengers were drowned; three other passengers were able to reach safety. Death claims have been dismissed by the Court of Claims after a trial on the ground that the sole cause of the accident was the negligence of the driver.

The proof shows that the highway had been plowed on the night of the accident and the plowed area extended onto the shoulder. The paved portion of the road was icy and slippery. It was snowing intermittently and visibility was poor.

As McCauley approached the scene of the accident a snow-plow was observed moving toward the highway in a side road on his left. The plow first stopped at the edge of Route 3 and then started in forward motion again. As McCauley saw this motion toward him he turned his car to the right so that its right wheels were on the shoulder of the road near the edge of the plowed area and continued in this position beyond the snow-plow. While in this position he was driving 20 to 25 miles an hour, but, by the testimony of a passenger, going " slower at the old concrete road " (from which the snowplow was coming).

He then tried to bring the car back on the paved portion of the road; the front wheel came up, but the rear wheel stayed on the shoulder and the driver " accelerated slightly to try to come on ". This was about 125 feet from the end of the bridge abutment on his right side. The rear wheel then came up on the pavement, " the back end shook " and the car skidded across the road, through the space between the guardposts, over the steep bank beyond the posts, and into the river.

All witnesses who examined the area in which the car was driven partly on the shoulder are in agreement that there was an elevation in the edge of the concrete pavement above the shoulder, and that this elevated area existed at the point where

McCauley had attempted to get the right wheels of his car back on the pavement.

The witnesses differed as to the height of the raised edge of concrete pavement above the shoulder. Two town highway employees said it was from one to one and one-half inches; a State trooper said it was three to four inches; one witness said it was from three to five inches. One of the town highway employees was a snowplow operator called by the State, who testified it was one to one and a half inches, and who examined the area immediately after the accident by walking with a flashlight; he testified that he noticed a tiremark along the edge of the pavement.

In describing this mark on cross-examination, he said that it was " on the edge " and that " it went for a little ways, and I couldn't see, tell for sure whether — it must have caught on the edge of the cement and went right back on." He testified to observing that while the surface of the shoulder was " snow " the surface of the pavement was " ice ".

The Court of Claims made no finding of fact on the height of the raised edge of concrete above the shoulder because it was of opinion, apparently, that regardless of what the differential in altitude between concrete edge and shoulder was, the State would not be liable under the facts of this case.

The court specifically refused to accept the proposed finding submitted by the State that " there was no more than an inch to an inch and a half difference in elevation between the hard surface of the road — and the shoulder ". This was marked by the Judge " refused except as found ". Nowhere in the findings is there any determination of what this elevation was. In the court's memorandum of decision it is merely noted that " There is a sharp cleavage in the evidence on this point.", and that " While there is a grave doubt whether the drop-off was five inches or not more than two inches, there was some drop-off from the pavement at points along the four hundred feet immediately west of the westerly end of the bridge."

The reason why the Judge felt this elevation of concrete pavement above the shoulder was irrelevant here and " not a proximate cause of the accident ", was that there was no emergency which would have justified McCauley's going onto the shoulder; and no reason why he should not have stopped, rather than going back on the pavement, in view of the fact that he was approaching the abutment of the bridge.

The Attorney-General, in support of the judgment, argues, in part, that since the pavement itself widened a little on the bridge the driver should have continued on the shoulder with-

out then trying to get back on the pavement. The State's brief on this aspect of the case says: "A car only ten or twelve inches off the concrete and on the shoulder would thus have avoided the abutment even if it had not been turned to the left in an effort to regain the pavement."

It is thus a crucial part of the argument that the McCauley car should not have gone on the shoulder in the first place because there was no emergency. It was, in the words of the State's brief " an unnecessary gesture ". Having gotten there, the argument continues, the car should either have stayed there and stopped; or stayed there and continued onto the bridge.

But it is not negligence to drive on the shoulder of a road to avoid some danger which seems apparent to the driver of a vehicle. The test of what such a danger is, and whether it would amount to an " emergency ", is what a reasonably prudent driver would do faced with such a situation. For example, driving onto a shoulder to avoid a truck which " appeared to her [the driver] to be partly on her side of the center line " has been held a justified use of a shoulder. (*Petrozak* v. *State of New York*, 189 Misc. 809, 811.)

This decision is cited by Davison, Claims Against the State of New York on page 522 as authority for the statement that the State owes users of the highway the duty of maintaining shoulders " in a reasonably safe condition for use by the prudent driver travelling at a reasonable speed in an emergency " (§ 50.01; see, also, § 50.02). The principle involved here is quite similar to that considered in *Goodwin* v. *State of New York* (274 App. Div. 824, affd. 298 N. Y. 873).

If a driver traveling on a slippery road sees a snowplow, proceeding toward his road from the left, stop and then start again toward him, he is certainly warranted in taking steps to avoid this potential danger. He might not be justified in a heavy application of brakes on ice, but he would surely be warranted in pulling, in part, off onto the plowed-out shoulder which, as it has been seen, was covered with snow rather than ice. This would help him to avoid the plow had it continued across the road and, at the same time, probably given him better control of the car than on the icy pavement itself.

The fact that we know now, after the event, that the plow did not actually come out as far as the eastbound lane in which McCauley was driving, does not change the situation as he faced it. The driver did not know this and was to be governed by the rule of reasonable precaution in the situation as he saw it.

That part of the decision of the Court of Claims which turns upon a holding that there was no justification for the driver's

going on the shoulder seems to us unwarranted; but whether in the light of after events it can be seen that it was not necessary to go there or not, it is clearly not negligent for the driver to have gone there; and it makes a hard argument to say that in a situation such as confronted McCauley, a reasonably careful driver would not have taken to the shoulder at the point he did.

Nor was it negligent, in our view, for him to try to get back on the road after he had passed the snowplow. Although the Court of Claims was of opinion that there was "no reason why he should not have stopped" it is open at least to serious question whether a driver should have stopped entirely under such surface and road conditions as existed and later, by a fresh start, tried to have gotten back on the paved portion of the road; or whether, while he had traction and momentum, to have attempted to get back on without stopping.

Had he continued on straight he would have been perilously close to the bridge abutment, and, on the bridge might have struck a raised concrete curb between the bridge abutment and the pavement. A driver would not be negligent because he did not follow that course. We are of opinion on reviewing this aspect of the case that McCauley drove with reasonable care and was not negligent.

The Court of Claims did not pass on the sufficiency or adequacy of the protective guards on the left side of the road above the river bank; nor on whether the State's maintenance of them was negligent at the point through which the car passed when it went into the river, apparently because in the opinion of the court the negligence of the driver was the "sole" cause of the accident. This seems to amount to a holding that if the driver was negligent even the passengers could not recover; even if the State was negligent in maintaining the guards whether or not such guards played some part in the ultimate occurrence of the disaster. This sole negligence of the driver, as we understand the court's reasoning is, as it has been seen, that he went onto the shoulder in the first place and did not stay there when he got there. The court said in its memorandum of decision that it was of opinion that there was no negligence on the part of the State "in connection with the barriers or posts" on the north side "which proximately caused or contributed as a proximate cause to the accident" and for that reason the court discussed it "no further".

Even if there were no negligence on the part of the State in the maintenance of the shoulder, but the car skidded through no negligence of the driver McCauley, his estate could recover

if the guardrails were negligently maintained and this was in part a cause of the drowning; and the estates of the passengers could recover in such a situation even though McCauley had been in fact negligent. It is not possible on this record, therefore, to disregard the danger created by the guardrails; and we are of opinion they were negligently maintained and that they were a part of the cause of the disaster.

Connecting the west abutment of the bridge on the north side of the road were two lines of cable running to two metal posts made of railroad rails, and anchored in the ground at the end of the second one. This cable guardrail ran about 20 feet in a westerly direction from the end of the bridge abutment, but also somewhat northerly a distance of 10.3 feet beyond the end of the westerly anchor of the cable rail was a wooden post; and 10.3 feet beyond that was another wooden post.

The first wooden post was north of the cable anchor rather than directly west of it; and the second wooden post was north by west of the first one.

The line of guardposts and cable extending from the west end of the bridge abutment on the north side, in total effect therefore, describes something of a curve to the north; and an examination of the maps in evidence and of the photographs which describe them show why they follow such a course.

A dirt road (not the one from which the snowplow came) joins the State highway from the north close to the west end of the bridge, but a steep bank down to the river lies in the angle of this meeting place. This steep bank down to the river exists throughout all the area in which either the cable guardrail or the wooden posts are located. It is abundantly established, and not in dispute, that both the cable guard and the wooden posts are on the State highway right of way and that their location and maintenance are the responsibility of the State.

Although the State might make provision for open access to the dirt road, it would not because of this be relieved of maintaining suitable protection to the users of the State highway against the danger from the steep bank on the State's right of way, and from the river below.

In skidding from the south to the north side of the road the McCauley car passed in the 10.3 foot space between the end of the cable guardrail and the first wooden post, and then on down the embankment into the river. The location of the first wooden post did not conform with the contract plans of the State which were received in evidence and which indicated that the first wooden post beyond the end of the guardrail was to be located

6.3 feet from the end of the guardrail rather than its actual location of 10.3 feet.

With such a location the space would not have been wide enough for the McCauley car or a car of normal width to pass through. Although these plans are not conclusive on the standard of protection required at this point, they are some evidence of it. There is proof for claimants that the posts were not located in accordance with reasonable engineering practice and there is no proof by the State that the guardposts as located did conform with reasonable standards.

Guardrails are not required because it is to be expected that ordinarily traffic will run off the edge of the road into places of great peril beyond. They are placed because of the possibility that in emergencies, and in spite of reasonable care, drivers will sometimes go off the paved portions of highways and beyond the shoulder of the road.

When the area beyond the shoulder is unusually dangerous, as where there is a high enbankment, a deep and rapid river, or a sharp mountainside drop, the public authority which maintains the road is required to establish and maintain appropriate safeguards against the hazard. (*Countryman* v. *State of New York,* 251 App. Div. 509, affd. 277 N. Y. 586; *Garrow* v. *State of New York,* 268 App. Div. 534, affd. 294 N. Y. 741; *Mason* v. *Town of Andes,* 261 App. Div. 354, affd. 287 N. Y. 616; *Huston* v. *County of Chenango,* 253 App. Div. 56, affd. 278 N. Y. 646.)

Indeed, the State here recognized the need for protection at this river bank by specifying the guards in the road plans and by erecting them. The recognized danger was not adequately provided against in the actual installation of guardposts. It is argued by the State that in any event the guards were for the protection only of traffic going in a westerly direction on the north side of the road; but such a protection against an obviously dangerous bank and river was not the special property of traffic moving in any direction. It was for the protection of any traffic on the road which through nonnegligent mishap needed protection against the high hazard of the river bank on the road's edge.

Common experience with highway casualty shows that vehicles in difficulty do not follow neat patterns by adhering to one side of the road. Guardrails are to protect traffic from either side which needs protection from the special hazards to which they relate.

We are of opinion, therefore, that the State was negligent in the maintenance of the road shoulder on the south side of the road and in the maintenance of the guardposts on the north

side and that these conditions in combination were effective causes of the accident; and that the driver McCauley and the passengers who lost their lives were free from negligence. Even if the finding of negligence in the south shoulder be eliminated, we are of opinion the negligence in maintenance of the north side guardrail played a sufficient role in the casualty to establish liability of the State, because in any event the skidding of the car was not due to the driver's negligence.

At least the two passengers who were drowned remained for some time in the icy water of the river holding onto the car and seeking rescue or opportunity to get to the shore and the terror and pain of this experience, as well as that of the driver McCauley who also attempted to save himself, warrant a finding of damage for conscious pain and suffering.

In the case arising from the death of Roderick McCauley, who was 58 years old, married and having two minor children as well as others of age, and who was a dealer in sand and gravel and building supplies, damages are found in the sum of $35,000 for wrongful death; plus $5,000 for conscious pain and suffering; plus special damages of $950 for funeral expenses and $776 property damage to his car, a total of $41,726. In the case of Wanda Deshaw, aged 14½, a high school girl, damages are found for $20,000 for wrongful death; plus $1,458 funeral expenses; plus $5,000 for conscious pain and suffering; and in the case of Joseph Salamy, aged 17, who was working and helping support his family, damages for wrongful death are fixed at $25,000; plus $1,035 funeral expenses; plus $5,000 for conscious pain and suffering. Credit against the Deshaw and Salamy awards is to be given for the $10,000 and $15,000 settlements which have been made respectively by the insurance carrier on the McCauley car.

The judgments should be reversed on the law and the facts and judgments directed for the claimants in accordance with this opinion, with costs to appellants.

Settle order.

REYNOLDS, J. (dissenting). We are unable to concur with the majority of the court, our opinion being that the judgments of the court below dismissing these claims should be affirmed.

The decision that there was no negligence on the part of the State which contributed to this unfortunate accident, and that the sole proximate cause was the negligence of the driver of the vehicle, Roderick McCauley, is amply supported by the evidence, and is sound.

This accident occurred on New York State Highway No. 3 near the Raquette River Bridge in the Town of Piercefield, St. Lawrence County. Route 3 is a concrete highway 24 feet wide consisting of two 12-foot lanes, widening to 28 feet at the bridge approach. On March 3, 1954 at about 11:00 P.M., McCauley, age 58, was driving his 1950 Ford sedan in an easterly direction on said highway returning home from a high school basketball game. He was accompanied by his son Francis, 19; Wanda DeShaw, 14; Joseph Salamy, 18; Colette Des Ormeaux and Almonzo Hutchins, high school students. It was a blustery wintry night. The snow on the road and on the shoulders had been plowed to a point approximately three feet from the edge of the paved portion of the highway. A light snow was falling and the visibility poor, due to a strong, gusty wind which at times created snow squalls. That the highway surface was slippery is undisputed. Trouble with the icy road conditions on this same highway had been encountered earlier in the drive by McCauley, who had "gone off the road", as witness Father Giroux put it, at Sevey's Corners about 12 miles back.

As McCauley drove his vehicle around a slight curve about 700 feet west of the bridge over the Raquette River, a snowplow, approaching the highway from the north at an intersection west of the bridge, came into view. McCauley's speed on the curve of about 30 to 35 miles per hour was accelerated somewhat coming toward the straight portion of the road. This speed could be reasonably found to be much too fast under the road and weather conditions. Claimants contend that when the lights of the snowplow came into view, McCauley "eased up" on the accelerator, touched his brakes lightly and gradually veered off to the right onto the shoulder area. The snowplow was approaching Highway Route 3 at the intersection of the "old concrete highway" which is 450 feet west of the bridge. Therefore after passing the snowplow McCauley was some 425 to 450 feet from the bridge. There were no cars or traffic ahead of him, or behind him. He proceeded at least 300 feet, the length of a football field, at a speed of about 25 miles per hour (there is no estimate of this speed except by the son, an interested witness) and at a point about 150 feet from the bridge, this same witness claims that his father attempted to ease the car back onto the paved portion of the highway slightly accelerating his speed and went into a skid. No attempt was made at any time over this 300 feet to reduce to a slow speed or stop. There is proof that the snowplow never entered the highway. Under these facts the claimants would have the trier of the facts find

first, that an emergency existed and second, prudent driving on the part of McCauley. From this distance of 150 feet the claimants' car went in an almost straight, undeviating line northeasterly across the highway, across the north shoulder, grazed a guardpost and then continued on into the river.

One of the claims of negligence on the part of the State was that the pavement was somewhat higher than the shoulder on the southerly side of the highway west of the bridge. Some of the testimony of this deviation is unsatisfactory because of different conditions prevailing and remoteness. It is difficult to tell from the evidence whether at the exact time McCauley's car was on the south shoulder there was any deviation due to the packed ice and snow. In fact, McCauley's son the passenger, testified that he could not tell whether they were on the paved portion of the highway or on the shoulder as they traversed most of the distance between the intersection at the "old concrete road" and the bridge. No finding was made by the court as to the amount of deviation, because he held it not to be a proximate cause of the accident. The most credible evidence was supplied by two of the three troopers who were there immediately after the accident, and their testimony was that the drop was from one to one and one-half inches. They were the investigating officers. A third trooper who had been detailed to traffic duty at the scene testified it was from two to four inches although on cross-examination he admitted that he had never communicated this appraisal at any time to the investigating officers with him.

The State's duty generally in regard to shoulder maintenance, as quoted in the majority opinion, is to keep the shoulders "in a reasonably safe condition for use by the prudent driver travelling at a reasonable speed in an emergency" and, of course, in an emergency to which he himself did not contribute.

As was stated in *Thompson* v. *State of New York* (154 Misc. 707, 710 [Ct. of Claims, 1935], mod. 247 App. Div. 858, affd. 247 App. Div. 858): "In these days of fast automobile traffic, a careful driver, through no fault of his own, is sometimes forced onto the shoulder of the road by a careless and negligent driver who crowds him off from the pavement, or a driver by accident in the night time might inadvertently drive onto the shoulder. It would seem, therefore, that the shoulder of the road, while it is not made to travel on, should be in such condition that it could be resorted to in an emergency without danger to life and limb. Of course, a driver who finds himself suddenly compelled to go onto the shoulder, or who finds that he has passed onto the shoulder inadvertently, must immediately bring his car

under control and move with such care and caution as the situation demands.''

Suffice it to say that the foregoing facts do not require that the trier of the facts find negligent maintenance of the shoulder under the circumstances, or if he did that it was a proximate cause of the accident (cf. *Edwards* v. *State of New York*, 5 A D 2d 1033).

Appellants additionally claim that the barriers on the north side of the highway, northwest of the bridge and at the entrance and along the easterly side of a private road to the Paul Smith electric plant were insufficient and negligently built and maintained. It was between these wooden posts that the car went in its course to the river. Highway Route 3 was straight for at least 700 feet west of the bridge. This accident did not occur on a curve or a grade. The Attorney-General argues and the court has found that the behavior of the McCauley car was not reasonably foreseeable. On this straight stretch of highway, crashing through barriers on the opposite side of the highway and partly along an intersecting road is certainly a remote possibility that those responsible for the design and maintenance of highways could not have been expected to anticipate. There were strong cabled steel barriers extending 20 feet from the bridge abutment. These wooden posts were obviously there as a warning to a person entering the Paul Smith Road. If these wooden posts were close together and the vehicle struck two of them there is no assurance that it would have prevented this car from continuing into the river. No-apparent attempt was made to change the course of the vehicle, or to stop it, over this substantial distance after the alleged skid on the shoulder. It continued on in an almost straight line into the river. These physical facts suggest speed not continuous skidding. The Attorney-General at a loss to understand the behavior of the car, opines with some merit because of the path taken by the car, that the driver must have mistaken the northerly bridge abutment for the southerly one, and thought he was on the highway.

There is no general or infallible rule as to the location or strength of barriers. There is no hard and fast rule as to the kind and character of a guardrail or barrier to be erected so that the highway may be deemed reasonably safe for the ordinary needs of travel.

As this court said in *Fitzgerald* v. *State of New York* (284 App. Div. 790, 791, motion for leave to appeal denied 308 N. Y. 1053): '' The State, of course, must recognize the occurrence of emergencies on its roads but its duty to anticipate a particular

result of an emergency does not rise higher than the level of reasonable foresight.''

To impose upon the State the burden of constructing substantial barriers at every point or of paying damages when unusual accidents occur would be to make the State an insurer against accidental injuries or death. In these days of very substantial traffic on our highways such a burden would be too much for the People of the State of New York to bear (cf. *Roberts* v. *Town of Eaton*, 238 N. Y. 420). In *Jacobs* v. *State of New York* (198 Misc. 406, 408) it was stated: '' There was no reason to anticipate that a car would leave the highway at the point where the Jacobs car did so. Of course, it might and did under ice conditions, but a similar mishap might have occurred at any point along the highway under such conditions. If the State must guard against such possibilities, it must line every highway with guardrails.'' In sum, there was ample, compelling evidence in the record to support the trier of the facts in his determination that the negligence of the State, if any, in the construction and maintenance of these barriers was not a contributing proximate cause of the accident.

In our view the decision that the negligence of the driver McCauley, upon the facts of this case, was the sole proximate cause of this tragic disaster is eminently sound. To hold the State of New York negligent and require it to respond in damages, either to the passengers or, a fortiori, the driver under these facts and circumstances is intolerable.

In *Tyrell* v. *State of New York* (6 A D 2d 958, 959) this court said: '' Certain it is, that, when there is a decision for the defendant by the trier of facts in an action of this sort, the court is not justified in setting it aside as against the weight of evidence unless it can be plainly seen that the preponderance in favor of the plaintiff is so great that the trier of facts could not have reached the conclusion upon any fair interpretation of the evidence (*Jarchover* v. *Dry Dock, East Broadway & Battery R. R. Co.*, 54 App. Div. 238; *Miculi* v. *New York & Queens County Ry. Co.*, 136 App. Div. 373; *Meyers* v. *Hines*, 199 App. Div. 594; *Voyes* v. *Kane*, 240 App. Div. 710; *Collins* v. *City of New York*, 263 App. Div. 893).''

The judgments should be affirmed.

HERLIHY, J. (dissenting). I concur with REYNOLDS, J., together with the following memorandum.

This unfortunate accident happened on a winter night in northern New York when merely driving on the road created a hazard of unusual risk. The driver and his passengers had

traversed the road earlier in the evening and were familiar with the general physical conditions there existing.

The majority have found negligence based upon a general finding of a drop between the road and the shoulder apparently based upon testimony of witnesses that the drop measured from one inch to five inches at various places along the road in the general location where the accident happened. There was testimony the road had been plowed earlier in the evening and the snow pushed two or three feet from the paved portion. Under such existing conditions, a finding of negligence was improper and while each case must be based upon its own particular facts, what this court said in *Edwards* v. *State of New York* (5 A D 2d 1033, 1034 [1958]) is appropriate to the present facts as to a drop between the shoulder and the highway proper: "any dangerous or hazardous condition which existed at or near the place of the accident was a result of natural causes, and not something for which the State can be held liable under the rule of reasonable care."

The facts do not justify the finding of any emergency for which the State might be liable.

The majority's second basis for negligence has to do with guardrails located on the *opposite side* of the road from the direction in which the automobile was traveling. The only theory for such finding must be based upon testimony that the said posts were not set in accordance with the specifications — 10.3 feet instead of 6.3 feet — and it is assumed, rightly or wrongly, that if the posts had been placed in accordance with the specifications that they would have prevented the accident. It is my understanding that the obligation of the State so far as the construction of barriers is concerned is that they [barriers] be sufficient for the protection of *travel generally*. The rule is set forth in *Countryman* v. *State of New York* (251 App. Div. 509, 513) where the court said: "There is no general or infallible rule as to the location or strength of barriers. They are to be placed where the way is perilous or where there are unusual or exceptional conditions, and they must be of a kind and so located as to furnish 'protection for travel generally.'"

The finding of negligence here — as to guardposts — is unrealistic and attaches an intolerable burden of liability on the State.

There was no proof offered to show the happening of any prior or similar accidents, or in fact any accidents at this location.

I am in accord with the majority that the theory applied by the lower court in dismissing the claims — driving on the shoulder of the road — was not justified, but I am not in accord with the theory [one or more] of negligence now advanced by the majority. To say that a set of facts such as here developed should have been anticipated and was foreseeable so as to constitute actionable negligence is placing a burden on the State that is not reasonable, equitable or in conformity with the well known and recognized rules applicable to the law of negligence.

The judgments should be affirmed.

BERGAN, J. P., COON and GIBSON, JJ., concur in Per Curiam opinion; HERLIHY and REYNOLDS, JJ., dissent and vote to affirm; REYNOLDS, J., in an opinion in which HERLIHY, J., concurs; and HERLIHY, J., in a memorandum in which REYNOLDS, J., concurs.

Judgments reversed, on the law and facts, and judgments directed for the claimants in accordance with the opinion, with costs to appellants.

Settle order on notice.