HOWARD C. BRISTER, an Infant, by His Guardian ad Litem, MICHAEL W. BRISTER, Appellant, v. FLATBUSH LEASING CORPORATION, Respondent.

Second Department, July 21, 1922.

Negligence — action for injuries suffered when plaintiff fell through ashpit door in court adjoining defendant's theatre — court which was level with sidewalk was used by patrons in going into and leaving theatre — no bar or warning against use of court — plaintiff strolled into court while waiting for companion to exchange tickets — plaintiff was patron of theatre and not trespasser and defendant owed duty of reasonable care.

In an action to recover for injuries suffered by plaintiff when he fell through an ashpit door in a court adjoining defendants' theatre it appeared that the plaintiff with two other boys had tickets for the theatre and that after reaching the theatre they decided to exchange their tickets for tickets for the next day; that the three tickets were given to one boy who entered the waiting line of people to take his turn at the window; that during the wait the plaintiff and the other boy strolled into a courtyard adjoining the theatre and while there the plaintiff fell through the ashpit door; that said courtyard extended all the way around the theatre, was asphalted and level with the sidewalk and was open to the sidewalk without barrier or sign forbidding its use; that the exit doors of the theatre opened onto said courtyard which was used by the patrons of the theatre as a means of exit after the performance and as a place where they went between the acts, and that said patrons leaving the theatre returned thereto by the side doors opening onto the courtyard.

Held, that the plaintiff was at the time of the accident a patron of the theatre and had the right to wait about defendant's premises until the exchange of tickets was completed and was not a trespasser in going into the courtyard, and, therefore, the defendant owed to the plaintiff the duty to exercise reasonable care to see to it that the ashpit cover or door was reasonably safe so that it would not collapse under the weight of the plaintiff while he was walking over it.

APPEAL by the plaintiff, Howard C. Brister, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Kings on the 9th day of February, 1921, upon the dismissal of the complaint at the close of the plaintiff's case, and also from an order, entered in said clerk's office on the same day, directing the dismissal of the complaint.

*Warren Bigelow* [*Silas B. Axtell* with him on the brief], for the appellant.

*William Dike Reed* [*William B. Shelton* with him on the brief], for the respondent.

KELLY, J.:

The trial justice granted defendant's motion to dismiss at the end of plaintiff's case in chief and the appeal is from the judgment

entered on the nonsuit.    The appeal from the order dismissing the complaint should be dismissed, without costs.

The plaintiff, a boy of the age of fourteen years, had purchased a ticket for the matinee performance at defendant's theatre and had entered the theatre with two boy companions.    The seats were not satisfactory, and before the performance commenced the boys determined to leave and return to the matinee on the following day.    Plaintiff and one of his companions gave their tickets to the third boy to present them at the box office and exchange them for tickets for the next day.    The boy with the three tickets had to take his place in a line which extended out of the lobby of the theatre where the box office was located, to Church avenue, and beyond the theatre property towards Flatbush avenue.    The boy in line was acting for plaintiff and the other boy.    They walked beside him while the line slowly went into the theatre.    The exchange of tickets was a regular incident in defendant's business. I think the three boys never lost their character as patrons of the theatre.    Whether we consider the fact that they had actually bought and paid for the tickets and still had them in their possession (because they had not been surrendered or exchanged at the time of the accident, and the possession of the boy in the line was the possession of the plaintiff), or whether we look on the boys as engaged in the purchase of a ticket for the matinee on the next day, I think that up to this point they were there as invitees.    So far as giving the tickets to one boy to exchange, this really was in furtherance of defendant's interests.    It shortened the line. When the line which stretched out one hundred feet from the door of the theatre moved up so that the boys came opposite an open courtyard alongside the theatre, the plaintiff and his companions, instead of continuing alongside the boy in line, walked into the courtyard which ran back alongside the theatre building some eighty-one feet at right angles to Church avenue.    This court-yard was twelve feet in width and extended all the way around the theatre.    It was as wide or wider than the sidewalk on Church avenue.    It was asphalted and level with the sidewalk.    It was open to the sidewalk without gate or barrier or sign forbidding its use.    The exit doors of the theatre opened on it and at the Church avenue entrance there was a large billboard against the wall of the theatre fronting on the courtyard advertising the performances. This open space was maintained by direction of the Building Code of the City of New York (Art. 25, § 527, subd. 2), which is chapter 5 of the Code of Ordinances of the City of New York.    It is described as an " open court or space on each side of the auditorium not bordering on a street."    It is provided that " The said open courts,

spaces, * * * shall not be used for storage purposes, or for any purpose whatsoever, except for exit *and entrance* [italics mine] from and to the auditorium and stage." (See Cosby's Code of Ordinances [Anno. 1922], p. 144, § 527, subd. 2.)

The evidence is abundant that this open space was used by the patrons of the theatre, from the date it opened, as a means of exit after the performance and as a place where they went between the acts to smoke, or stretch their legs. While there is no evidence that the doors opening on the alley or open space were the regular entrance doors of the theatre, it is shown that during performances when the patrons went out by these side doors there was a man there in uniform who gave them return checks, and, as we know, patrons going out between the acts might leave the theatre property and returning they would enter the theatre through this open space, giving up their return checks at the side door. The boy plaintiff had been to this theatre repeatedly during the thirteen months preceding the accident since it was opened. He used the side doors and this open space on leaving the theatre, and he saw other people using it every time he was there. He testifies that he saw " Lots of them, men and women, * * * during the intermission and before the show passing away the time walking off in front and along the side there waiting for it to open." He had seen children there. The doors opening on this open space have on the inner side, inside the theatre, the word " push." The boy himself had used this space repeatedly.

The plaintiff testified as to the happenings on the day of the accident. He said: " We were cold, and naturally it was snowing and we walked back there to keep the circulation up * * * it was just a natural impulse to spend the time * * *. Just casually went back there." There was snow on the ground in Church avenue, it had been snowing for two hours, but " In the alley there wasn't any except up near the front of it " (*i. e.*, at Church avenue). Back from the street and about opposite the side doors of the theatre defendant maintained a furnace room under the open space or courtyard, with an opening to an ash-pit, covered by two iron doors which laid flush with the asphalt floor or surface of the courtyard. The two boys strolled through the courtyard to the rear end of the theatre and turned back toward the street, the plaintiff says, " to meet Robbie and I was a little ahead of Oliver [the ten-year-old boy] and just as I stepped on the door I went right through. I didn't stand on it at all. I was just in the act of walking and as soon as I got my feet on it I went through * * * the iron door fell through with me and I fell down to the bottom."

The boys had walked over the doors without accident on their way from the street. On retracing their steps the door collapsed. The plaintiff was severely and permanently injured. His companion, the boy in the line to exchange the tickets, was informed of the accident and immediately went around and found plaintiff down in the ashpit, a drop of some eighteen feet; he saw the door which had fallen in; he says he saw no hinges on the door. The photographs in evidence show that it was constructed to rest on the flanges of a frame which was set into the concrete. It is evident that if it was in order it would not have given way and fallen into the pit. The plaintiff's evidence as to the physical conditions about the open space or court, its use by patrons of the theatre and as to the happening of the accident was corroborated by his boy companions and by other witnesses.

But the learned trial justice was of opinion that at the time of the accident the plaintiff was not a patron of the theatre, and he granted defendant's motion for a nonsuit at the close of plaintiff's case in chief upon two grounds which he stated: " They [defendant] owed him no duty, and second, he was a trespasser."

I am of opinion that upon the evidence in this record we cannot say that this boy was a trespasser or that the defendant owed him no duty. I think the boy was still a patron of the theatre. He had paid for his ticket and he had not yet seen the show. His giving the ticket to his friend to actually make the exchange was the reason for his remaining about the theatre. He had exchanged tickets before; he testifies: " They always exchanged them without question. They have with me, anyway." I think he had a right to wait about defendant's theatre until the exchange was completed. Instead of standing in the lobby or out on the steps or on the sidewalk, he walked into this open space which he had used continuously since the theatre opened, with all the other patrons, in connection with his attendance on the performance. It was a way used by the patrons to go out, and to come in after they had gone out. It was open to the street without barrier or warning against its use. It seems to me it was a very natural thing for this boy to use this space while waiting for the exchange of his ticket.

In *Sterger* v. *Van Sicklen* (132 N. Y. 499) the plaintiff, who lived in adjoining property, had gone to defendant's house to get her young children and bring them home. Instead of going out the front door, she came out the back way, intending to reach her home through defendant's yard and an opening which had been made in the division fence by knocking a couple of boards out. A step in the back stoop broke, causing her to fall and resulting in injury. The court held that she was not exercising a right or

engaged in a matter of common interest by the occupier's invitation, that she was a mere licensee and could not recover damages from defendant. Judge PARKER cites the various cases bearing on the subject in his opinion. But he says (at p. 503): "There are cases where the use to which an owner of property puts it is of such a public character that he is bound to observe reasonable care in keeping it in such a condition as to save, harmless, those who are invited to come on to it for the benefit and profit of the owner."

The distinction I have in mind is that the physical conditions surrounding this open space and the use to which it was put by defendant and the persons resorting to the theatre were such as to call upon defendant in the exercise of reasonable care to see to it that this ashpit cover was reasonably safe, so that it would not collapse under the weight of a boy fourteen years of age walking over it. I think it may be said upon the evidence here that this open space was provided for the use of patrons of the theatre. This must be conceded, but defendant argues that the use was confined to persons coming out of the theatre through the side doors opening on the space, during a performance or after a performance. We have seen that its use was not confined solely to people coming out, and leaving the theatre, because it was resorted to between the acts like a smoking room, and the patrons came out and went back and were given return checks under which as we know they might have left the theatre property during the intermission and returned through this open space and the side doors. Here was an open public use observed by this boy ever since the theatre opened. He was about the theatre lawfully, he had purchased a ticket and was waiting to have it exchanged under the defendant's regulations. He was not surrendering it and demanding his money back. The defendant's argument that he had no business about the theatre seems to be entirely without justification.

I do not dispute the general rule contended for by defendant that a property owner is not obligated to keep his property safe as against trespassers, but I think upon the facts here the boy was not a trespasser. He was where he had been repeatedly while a patron of the theatre, in a courtyard resorted to by the patrons for rest and recreation during the performance, and he was lawfully there waiting for his exchanged ticket and, using this open court as he did, was an invitee. "'To come under an implied invitation as distinguished from a mere license, the visitor must come for a purpose connected with the business in which the occupant is engaged. * * * There must be at least some mutuality of

interest in the subject to which the visitor's business relates.' (*Plummer* v. *Dill*, 156 Mass. 428.)   We know of no better definition."   (*Meiers* v. *Koch Brewery*, 229 N. Y. 10.)   In the case at bar the plaintiff's presence was more closely connected with defendant's theatre enterprise than the fireman Meiers with the defendant in the *Koch Brewery* case cited.

The judgment should be reversed upon the law and a new trial granted, with costs to appellant to abide the event.   The appeal ·from the order dismissing the complaint should be dismissed, without costs.

BLACKMAR, P. J., RICH, JAYCOX and YOUNG, JJ., concur.

Judgment reversed on the law and new trial granted, with costs to appellant to abide the event.   Appeal from order dismissing complaint dismissed, without costs.