Hillsborough, ⎱
 Jan. 3, 1933. ⎰ ·

MARY L. GHILAIN, *Adm'x v.* ALPHONSE L. COUTURE & a.

John L. Sullivan, Laurence I. Duncan and Robert W. Upton (*Mr. Duncan* orally), for the plaintiff.

*Warren, Wilson, McLaughlin & Bingham* (*Mr. Bingham* orally), for the defendants.

MARBLE, J. On February 13, 1924, the plaintiff's intestate attended an evening performance at the defendants' motion-picture theater in Manchester. He was acquainted with the operator of the

picture machines and had an engagement with him after the show.

The projection booth was situated at the rear of the gallery and was elevated about seven feet above the level of the floor. A railing separated the seats from the back aisle, and this railing was recessed to form an alcove for the steps which led to the booth. A hand-rail was attached to these steps. The treads were four inches deep and rose almost perpendicularly to a platform two and a half feet square, in front of the door of the booth.

It could be found that the plaintiff's intestate purchased a ticket and was admitted to the gallery, where he remained seated until about half-past nine when he left his seat to join the operator in the projection booth. As he opened the door, one of the reels, which the operator had been preparing for use, caught fire. Failing in his attempt to extinguish the flames, the operator turned to the electric light switch, which was opposite the door, but could not reach it. He then left the booth, believing that Ghilain had gone out before him. When he reached the foot of the stairs and did not see Ghilain, he turned back, but by that time the booth "was a roaring furnace." Ghilain did not escape from the booth and died from the severity of his injuries.

The plaintiff does not contend that the fire was caused by the operator's negligence. The booth was constructed of metal, and the films, comprising about three thousand feet, constituted the only inflammable substance there. The claim that a motion-picture projection booth is a dangerous place was not seriously questioned.

A chemist, called on behalf of the plaintiff, testified that films are made of a material "very similar to gun cotton mixed with a small amount of camphor, dissolved in ether," that the heat from the light in a motion-picture machine is sufficient to ignite the film, that it burns "some ten or twelve times as fast as a similar thickness and size of wood or paper," and that it is impossible to put out such a fire with any form of fire extinguisher.

In their brief, plaintiff's counsel correctly state the legal situation here presented as follows: "The plaintiff's intestate was present upon the defendants' premises as an invitee. Having purchased a ticket to see the performance he was there for a purpose beneficial to the defendants. The defendants owed to him as an invitee the duty to use reasonable care to protect him from dangers to which they knew he might be exposed. *Colby* v. *Treisman*, 85 N. H. 19. The least that they could have done in fulfillment of this obligation was to give him sufficient warning to enable him to avoid the danger which he in fact encountered. *True* v. *Creamery*, 72 N. H. 154."

A theater-proprietor's duty to keep his theater in a reasonably safe condition for the benefit of his patrons, like the duty of a landowner to his invitees or that of a master to his servants, extends to all parts of the premises which he knows or ought to know his patrons are accustomed to visit. The general principles involved are discussed in the following cases: *Edwards* v. *Tilton Mills*, 70 N. H. 574, 575, and cases cited; *Barber* v. *Company*, 79 N. H. 311, 315; *Frear* v. *Company*, 83 N. H. 64, 68; *Duteny* v. *Company*, 84 N. H. 65; *Pickford* v. *Abramson*, 84 N. H. 446; *Colby* v. *Treisman*, 85 N. H. 19, and cases cited; *Cable* v. *Company*, 85 N.H. 258, 261; *Dillon* v. *Company*, 85 N. H. 449, 452; *Schofield* v. *Wood*, 170 Mass. 415; *Purdy* v. *Company*, 220 Mo. App. 854; *Brister* v. *Corporation*, 195 N. Y. Supp. 424. It could here be found that the defendants' implied invitation to their patrons extended to access to the booth.

The cases in this jurisdiction on which the defendants rely concern the rights of trespassers whose presence at the place of injury the defendants were not bound to anticipate.

Nor is the question here merely one of constructive notice. On the evidence the jury were fully justified in finding that the defendants had actual knowledge that some of their patrons were entering the booth.

The assistant manager of the theater testified that it was dangerous for anybody to be in the booth, that people were attracted there, and that it was necessary to give the ushers instructions to keep patrons out; that "all people are curious" and "like to find out and see these things"; that there was no notice or anything about the booth that would give warning of the danger, and that "anybody could run up to those machines without being noticed."

The operator testified that "on one or two occasions" people had come up and looked into the booth, that the door of the booth was not locked, and that whenever they came up he took it for granted that they had permission. One of the ushers testified that people "love to see the machine" and that he could recall "about six or seven" times when patrons had tried to go into the booth. The instructions to the ushers were to refuse admission to the booth to any person who did not have express permission from the management. However, the ushers themselves went in and out of the booth on errands for the operator, and the only usher on duty in the gallery after nine o'clock that evening was absent on such an errand when the accident occurred.

Moreover, salesmen as well as employees of the theater were accustomed to enter the booth while the show was in progress. So far as

the observation of the public was concerned, there was nothing apparently (except in the case of the ushers who were in uniform) to differentiate those who had express permission from those who did not. This visible use coupled with the absence of any barrier or printed notice to keep out might well lead patrons, especially those who knew the operator and desired to speak with him, to believe that their presence in the booth was not forbidden.

The jury could properly find that the ordinary man in the defendants' situation would have understood that such belief might be entertained. If so, it was the defendants' duty to do what reasonable care required under the circumstances.

But the case does not rest upon this proposition alone. One of the material circumstances to be considered was the actual knowledge which the defendants possessed (*Sevigny* v. *Company*, 81 N. H. 311, 313), and if this knowledge was greater than that which they would have been charged with if ignorant, their duty to take protective action was correspondingly increased. Since it appears that they took some steps to prevent the entry of patrons into the booth, it could of course be found that they knew precaution was necessary. This being so, the question of the sufficiency of the particular measures adopted was clearly for the jury.

On the issue of contributory negligence the defendants had the burden of proof. P. L., c. 328, s. 13. It was not incumbent upon the plaintiff to prove that the defendants' knowledge of the danger was superior to Ghilain's, for the defendants were not entitled to invoke the doctrine of assumed risk in their defence. *Vandell* v. *Sanders*, 85 N. H. 143, 144; *Hussey* v. *Railroad*, 82 N. H. 236, 241; *Kambour* v. *Railroad*, 77 N. H. 33.

*Judgment on the verdict.*

BRANCH, J., did not sit: the others concurred.