Caroline K. Simon, J.
The government of the State of New York, in the exercise of some of its executive functions, occupies, maintains and controls a building located at 80 Centre Street in Manhattan, wherein branches of the Departments of Labor, Taxation and Finance, Motor Vehicles, Law, and other agencies function. The fourth floor of this building is occupied by offices of the Attorney-General, and houses members of his staff who work in various bureaus of the Law Department.
Room 408 contains facilities for the use of reporters assigned by the metropolitan newspapers to cover news emanating from the Attorney-General’s offices. These facilities include desks, chairs, typewriters, telephones, coat racks, paper, etc.
Room 412 is the office of the Executive Assistant to the Attorney-General, whose desk, together with the desk of his assistant, are placed in two corners of one side of the room. On the opposite wall, approximately eight feet from the assistant’s desk, and affixed to a concrete pillar, is a washbasin above which towel and soap dispensers are installed. The single pedestal basin is oval, and made of white porcelain, as are the hot and cold water spigot handles, placed to the left and right, respectively, of the white porcelain drain control knob centered at the back edge of the basin. No partition or screen separated the washbasin from the room.
On June 12, 1964, at about 2 o’clock in the afternoon, Mr. Sydney Schahberg, a news reporter for the New York Times then assigned to city and State agencies, including the Department of Law, as part of his reportorial duties visited Room 412 to check on possible news releases. He testified that, seated in a chair while engaged in conversation with the assistant at her desk, he heard a steady audible drip of water from the faucet on the washbasin, which drip was loud enough to become annoying and disruptive of conversation. He further testified that the drip had been audible during his presence in that office for over a period of many months, and frequently had been discussed in conversations he had with staff members of the Attorney-General’s office who used the room. No rebuttal of this testimony was adduced.
He interrupted his talk, got up from the chair, went over to the basin and, with his right hand, in a counterclockwise motion, turned the cold water knob, which broke in his hand. The white porcelain sleeve, which covered the shaft of the *118 single prong lever-type handle, split into pieces, one of which cut into his wrist, causing damage for which he seeks to recover $250,000.
The claim has been timely filed in the Court of Claims on July 1, 1964, and has neither been tried nor brought before any other court or tribunal.
Mr. Schanberg testified that his wrist was bleeding profusely. He was given immediate first aid by the building’s nurse. The police were notified, an ambulance arrived, and he was taken to Beekman-Downtown Hospital. There the injury was diagnosed as a two-inch laceration of the wrist, a severance of the median nerve and the palmaris longus tendon of the hand and of the flexor sublimis of the index and middle fingers, and a partial severance of the flexor pollicis longus and flexor carpi radialis longus tendon; all injuries being on the right hand. Claimant had not before injured his right hand.
A traumatic surgeon was summoned, claimant was X-rayed and prepared for major surgery, and under general anesthesia the median nerve was repaired, the palmeris longus tendon was excised, and the flexor carpi sublimis tendon to index and middle finger was repaired. Claimant’s right arm was elevated, immobilized and splinted in plaster, antibiotics were prescribed, and he remained in the hospital until June 30.
On June 16, at the operating surgeon’s request, he was examined by a specialist in physical rehabilitation, who instructed him in shoulder and elbow motion exercises to prevent further contractures. After his discharge from the hospital, Mr. Schanberg was again examined by the rehabilitation specialist, in September of 1964 and in June of 1966. Loss of sensation at the distal ends of the right thumb, index and middle fingers was noted, as well as a swelling of the volar aspect of the right wrist, which claimant’s expert ascribed to the damage to the nerve, and which he regarded as permanent in character. This ganglion, 1 inch by % inches, disturbs claimant mentally and physically.
It has long been the rule in New York, in conformity with ancient English common law, that those who enter premises upon business which concerns the occupier, and up oil his invitation, express or implied, are owed an affirmative duty to protect them, not only against dangers of which he knows, but also against those which with reasonable care he might discover. (See Prosser, Torts [2d ed.], p. 453.)
The American Law Institute makes a somewhat different classification, omitting all references to invitees, but first distinguishing between trespassers and licensees, and then separat *119 ing the latter category into “gratuitous licensees ” and “ business visitors ”. (See 3 Warren’s Negligence, p. 204-205). The business visitor is defined as “a person who is invited or permitted to enter or remain on land in the possession of another for a purpose directly or indirectly connected with business dealings between them.” (2 Restatement, Torts, § 332.)
It is clear to the court that Mr. Schanberg was legitimately on the premises in connection with duties that were useful to both his employer and to the State of New York. Accordingly, the latter was under a duty to use reasonable care to prevent injury to him, consistent with its ability to apprehend danger to him from his presence there or from his use of its facilities.
As regards the particular instrumentality causing claimant’s injury, Warren’s Negligence (vol. 5, p. 338) has this to say: ‘ ‘ There are cases in which injuries result from the condition of the faucet itself, particularly where this breaks. The rule here is the usual one that would apply to the owner of a building generally. He would be required to use reasonable care to construct and maintain the faucets in such a condition that they could not cause injury. ”
Claimant testified that, for a year during which he regularly was at the office, the faucet noticeably dripped. No contradiction of this testimony was presented. The court finds that the faucet was in poor working condition for the year preceding the incident at issue. It was in a State office which was regularly used by State employees and maintained by State staff. Therefore the court further finds that the State had notice of the faucet’s faulty condition.
Pieces of the porcelain handle were introduced into evidence as State’s Exhibit A. The court observed the grainy surface of the porcelain and the appearance of tiny hairline cracks. Claimant’s expert, a safety engineer for 30 years, testified that the drip of a faucet is initially caused by the wear of washers, which are made of a composition material. When the drip continues for an extended period of time and the faucet is in regular use, the washer may disintegrate and the brass valve seat becomes chewed or gouged by the twisting action of the stem, thus requiring an increasing amount of force which, nevertheless, cannot completely stop the drip. This continual stress and strain, he testified, can weaken the porcelain and cause the appearance of hairline cracks on its surface.
The State’s expert, a consulting engineer, submitted a report and testified to having conducted a series of tests made in his laboratories on similar porcelain faucet handles. His technique was to drop a one-pound ball on the handles from various *120 heights, measuring the impact force required to cause failure of the handles. He stated that his microscopic examination of Exhibit A revealed no defect in the structural composition of the porcelain. Upon cross-examination, he admitted that his tests did not include the use of counterclockwise pressure on the handle, similar to the energy exerted on the handle by a right-handed 30-year-old male such as Mr. Schanberg, who, on the accident date was 5 feet 9% inches tall and weighed about 145-150 pounds.
The court finds that the State’s tests did not reproduce the actual situation, since they did not include the twisting motion essential to turn the faucet. Though scientific and interesting, the court regards them as less persuasive than claimant’s expert’s testimony.
The State’s building maintenance supervisor, in charge of 10 employees, testified that the building had been erected in 1927, at which time the basin had been installed, and that four annual diaries, which included the years 1961 through 1964, and which were introduced into evidence, showed that the basin waste line was last repaired in 1961, although this did not include repairs to the faucet. There was no testimony adduced relating to repair of the faucet prior to the date of the accident.
Claimant’s counsel, in his trial brief, cited Kane v. Ten Eyck Co., (267 App. Div. 789 [1943], aff. 292 N. Y. 701), and Jungjohann v. Hotel Buffalo, (5 AD 2d 496 [1958]). In the latter case, Judge Kimball’s opinion commented on the lower court’s decision, in part, as follows (pp. 497-498): “ It is sufficient to point out the basic ground on which rested the court’s holding that the facts sustained the invocation of the doctrine of res ipsa loquitur. The control of the instrumentality which caused the injury was in the defendant. Justice Bergan wrote: ‘ Here plaintiff was a guest in a hotel. The hotel owed him the duty of providing accommodations that were reasonably safe for the use contemplated by the parties and, where it furnished appliances, of furnishing them in such a condition that with ordinary use they would be reasonably safe. ’ ”
Both cited eases involved the use of faucets in hotel rooms, and the court finds analogous the fact situation in the instant claim in which the faucet was on a washbasin in the public relations officer’s room to which claimant, by the very nature of his work, was an invitee.
Furthermore, under the res ipsa loquitur doctrine, where the injured person is without fault, and the object is shown to have been under the exclusive control of defendant, and the injury is of such a nature that it would not have occurred if proper *121 care had been exercised, then reasonable evidence has been presented, in the absence of any other explanation, that the injury was caused by defendant’s lack of care. This presumption has not been rebutted by the testimony introduced by the State. The court finds that the injury was the competent and producing cause of claimant’s present condition.
The court recognizes that claimant has suffered an injury which has left his right hand partially and permanently impaired as to function and sensation with a 40% motor and sensory loss. Though claimant as a reporter uses his head more than his hands, it is essential that he type his stories and the injury has made it more difficult for claimant to do so. Mr. Schanberg, who was and is right-handed, also has difficulty in writing with his right hand, and is slowed down in many right-handed functions such as dressing and carrying. Sports such as softball, tennis and golf are prohibited by doctor’s orders. Most serious, however, is the loss of sensation in his fingers. This loss means he would not know by feeling if he was being burned by water too hot to use or by flame.
No claim has been made for loss of future earnings, and Mr. Schanberg’s professional career has not shown any adverse effect as a result of this incident. On the contrary, his reportorial talents have gained greater monetary recognition by his employer subsequent to the accident.
Claimant alleged, and there was some medical testimony to the effect that a second operation may become necessary to correct the growth of sizeable scar tissue visible and seen by the court at the site of the lesion. The proof was sufficient for the court to recognize this possibility. In addition, evidence was introduced that Mr. Schanberg had developed an allergic skin reaction as a result of the administration to him of antibiotics during his hospital stay. The court has considered this proof in its award.
The State’s motions to dismiss for failure to preponderate, made originally at the conclusion of claimant’s case, and renewed at the end of the trial, upon which decision was reserved, are now denied.
For all damages suffered by claimant, including medical expenses and therapy treatments and the impaired use of his right hand, the court awards the sum of $20,000.