Milton Alpert, J.
The State of New York maintains and occupies a building at 80 Centre Street in the City of New York wherein various agencies of the State government are located. On the fourth floor of the building are offices occupied by the Attorney-General and members of his staff.
Claimant is a news reporter for the New York Times and, in 1964, was assigned to gather news from State agencies in the City of New York and from some city agencies. He had *606 the so-called “ State Beat.” In the course of his duties, he regularly visited the New York City offices of the Attorney-General at 80 Centre Street. To assist representatives of news media, the Attorney-General provided a “ press room ” in Boom No. 408 of 80 Centre Street. This area was equipped with desks, typewriters and telephones. However, it was customary for reporters to receive and discuss press releases in the adjoining rooms, No. 410 and No. 412, where various members of the Attorney-General’s public relations staff maintained their offices.
Claimant very often was invited into these offices to receive press releases and other news information concerning the Attorney-General’s office. He was also expected to come to these offices to discuss matters and to obtain answers to questions which might lead to his preparation of news stories concerning the subjects under consideration.
Boom No. 412 was occupied by the Executive Assistant to the Attorney-General and the assistant to such Executive Assistant.
The room contained two desks on one side thereof. On the opposite wall, approximately 8 to 10 feet from the assistant’s desk, and affixed to a concrete pillar, was a washbasin or sink. It was a single pedestal basin, oval in shape, with a white porcelain surface. There were two porcelain faucet handles above and parallel to a shelf-like flat area above and behind the basin portion. There was a handle on each side of the center combined waterspout and drain control — that for hot water was on the user’s left and that for cold on the user’s right. The handles of the faucets were made of porcelain, and were of a bar or lever type in shape, rather than of spoke or wheel design. The handles were attached by means of a cement-type adhesive substance to a screw-type stud which extended out from the base of the faucet structure. The stud had a brass exterior surface, the interior being of compressed metallic granular construction.
On June 12, 1964 at about 2 o’clock in the afternoon, claimant visited Boom No. 412 in his usual and normal routine in seeking news releases. At that time, the room was occupied only by the executive’s assistant.
Claimant testified that he sat down in a chair near this assistant’s desk and engaged in conversation with the assistant. During the conversation, claimant testified that there was a steady, audible drip of water in the washbasin, that it was a kind of splashing sound, and that it was audible to the point of disrupting the conversation. Claimant further testified that *607 he had heard a dripping sound in that washbasin before on practically every visit to the room, that on occasion he had used the washbasin to wash his hands, that he had thus previously identified the drip as coming from the cold water faucet, that he had been unsuccessful in stopping the drip on those occasions but had been successful in diminishing it, and that he had asked the room occupants in a joking manner when was it going to be fixed.
On this particular day, claimant testified that the drip was so audible that it was disturbing the conversation and that he got up from his chair and walked over to the washbasin and, with his right hand clasped around the handle and thumb extended, turned the cold-water knob in a counterclockwise motion so as to diminish the flow of water — he did not expect to stop it altogether. He testified that he stopped when he arrived in front of the washbasin, that he exerted energy to turn the handle from his right shoulder through his right arm, that he dipped his right shoulder in doing so, and that his right foot was forward a bit. He described his effort as exerting pressure by dipping his shoulder, exerting energy through his arm, turning his right wrist out and dropping the level of his right wrist below that of the level where his fingers and upper palm grasped the handle. The handle broke — this included the screw-type stud and the porcelain sleeve which covered the stud or core. The porcelain sleeve split into pieces. One piece remained attached to the core and base and it probably was the one which cut into claimant’s right wrist below the center of the palm, causing the injuries for which claimant here seeks to recover damages in the sum of $250,000.
The claim was timely filed in the Court of Claims on July 1, 1964. The claim was tried in January of 1967 and resulted in an award to claimant. On appeal to the Appellate Division, Third Department, the judgment was reversed and a new trial directed (Schanberg v. State of New York, 30 A D 2d 712, revg. 53 Misc 2d 116).
The instant decision is on such new trial which was had in December, 1968.
Claimant was legitimately upon the premises in connection with his duties that were useful to his employer, as well as to the State of New York. The distinction between a visitor who is a mere licensee, who assumes all the risks of the premises except those resulting from intentional, wanton or malicious acts, and one who is on the premises by invitation, turns largely on the nature of the business which brings him there (Hall v. State of New York, 173 Misc. 903, affd. 265 App. Div. 1037). *608 Claimant clearly was there as an invitee in a business relationship. (See Cesario v. Chiapparine, 21 A D 2d 272.) As such an invitee, the State was not an insurer of claimant, but the State owed him the duty of using reasonable care to prevent injury (3 Warren’s Negligence, § 4.01, pp. 231-233). The State had to use reasonable care to keep the premises in a safe and suitable condition so that those coming upon it would not be unusually and unreasonably exposed to danger. The State owed him the duty of guarding him from dangers known to it, but not to him, as invitee (Hall v. State of New York, supra). This rule applies only to the portions of the property as the claimant was invited to enter, or which it might reasonably be expected that claimant would go in answer to the invitation, expressed or implied (Brister v. Flatbush Leasing Corp., 202 App. Div. 294).
Claimant was invited to use the premises of Boom No. 412 and, accordingly, the State was under a duty to use reasonable care to prevent injury to him.
The building maintenance supervisor’s testimony taken at an examination before trial was read into the record. He stated therein that the building was constructed in 1927 or 1928; and that he had been employed by the State at 80 Centre Street for a period of 30 years, was in charge of maintenance and supervised 10 employees. He stated that repairs to the plumbing were made by the plumber, although at times, he made plumbing repairs and was familiar with plumbing and the repair thereof. No evidence, however, was elicited as to repairs to the faucet in question.
‘ ‘ Where the instrumentality which produced an injury is within the exclusive possession and control of the person charged with negligence, and such person has exclusive knowledge of the care exercised in the control and management of that instrumentality, evidence of circumstances which show that the accident would not ordinarily have occurred without neglect of some duty owed to the plaintiff is sufficient to justify an inference of negligence (George Foltis, Inc. v. City of New York, 287 N. Y. 108, 114-115.) In such circumstances, the doctrine of res ipsa loquitur relieves the claimant from the burden of producing direct evidence of negligence; but it does not relieve a claimant from the burden of proof that the person charged with negligence was at fault, or that claimant was free from contributory negligence (George Foltis, Inc. v. City of New York, supra; Parsons v. State of New York, 31 A D 2d 596).
Here, the faucet was exclusively under the control and maintenance of the State, and the State had exclusive knowledge of the care exercised in the control and maintenance of that instru *609 mentality. Claimant, under the operation of the doctrine of res ipsa loquitur, is relieved of the burden of producing direct evidence of negligence, but must prove that the State was at fault and be free from fault himself (George Foltis, Inc. v. City of New York, supra).
There are two classical, res ipsa loquitur cases in New York State relating to the •breaking of porcelain water handles by hotel patrons using reasonable force in attempting to shut down a flow of water (Kane v. Ten Eyck Co., 10 Misc 2d 398, affd. in memo opn. 267 App. Div. 789, affd. 292 N. Y. 701; Jungjohann v. Hotel Buffalo, 5 A D 2d 496). In both of these cases it was held that the occurrence of the breaking of porcelain water handles while being turned by hotel guests gave rise to the application of the res ipsa loquitur rule and thus the inference of negligence on the part of the hotel operators who had exclusive control over installation and maintenance of the water handles. It is noted that in both of these cases the hotel operators were held not to have overcome such inference and were held liable for the injuries sustained by their guests as the result of the breaking of the porcelain handles.
The court finds the rulings of these cases to be applicable in the instant case.
Here, the State had such exclusive control over installation and maintenance and thus the inference of negligence on its part is found by the court to have existed.
The court notes at this point that Kane and Jungjohann are of additional interest here in that they demonstrate that other porcelain handles have been broken under what was found to ■have been reasonable use and thus we are not here dealing with an unusual or improbable event for which there is little or no precedent.
Claimant’s testimony was to the effect that he used the handle as one would ordinarily use such a handle in turning off a water faucet. The hospital record which was offered as an admission against interest and whose exclusion' upon the first trial was one of the elements which prompted the reversal of the judgment and direction of a new trial, states that the claimant “ was forcing a porcelain handle, which broke ”. The accident report prepared by the claimant’s employer was also admitted as an admission against interest and as a due-course business memorandum. It stated that “ in attempting to close a water faucet with the base of my right palm, the faucet broke ’ ’.
The maintenance supervisor, as well as the plumber who was employed by the State at 80 Centre Street and who also testi *610 fied on behalf of the claimant, indicated that usually where a dripping faucet is concerned, a repair is made by renewing the packing or inserting a fresh washer. However, if the seat of the faucet is scored, a fresh washer will not stop the drip. Tri such cases, new faucets are usually installed.
At the instant trial the plumber testified that the old washer was worn “ a bit ” but not enough to leak — that it was able to hold water. When confronted with his testimony at the previous trial that the washer was worn, he stated that his testimony then was the truth.
Neither could explain the cause of the drip noi recall any recent details as to requisitions for repair. Testimony of the plumber at an examination before trial was read to the effect that there were no complaints or repairs, according to his records, during the two-year period preceding the accident.
The critical issue here concerns the amount of force used by claimant as related to the presumed negligent condition that existed and his freedom from contributory negligence.
The State produced a consulting engineer who conducted tests on materials, metals and the like. He conducted tests on similar faucet handles and he examined the broken faucet.
His examination of the broken faucet disclosed a brittle type of fracture which he explained was the result, not of metal fatigue, not of deterioration, but of an impact or a striking kind of force — a kinetic force. He reached this finding because the break had a lack of bending of its inner metallic screw stud and was crystalline. He testified the break was caused by a moving source of energy.
He then testified as to how much moving force was required, in his opinion, to cause such a break. In his opinion, a break such as the one that occurred, could be caused by an individual in turning such a handle with arm and shoulder pressure provided there was also torque. He described tests he made on similar handles furnished to him by the State and reported that in one instance a one-pound weight dropped 24 inches caused the same type of brittle-break. Other tests required higher drops up to 36 inches.
Claimant produced an engineer who was an expert in metallurgy. He, too, testified that such a fracture could be caused by a dynamic force. Belying on the State’s expert’s testimony concerning the dropping of a pound weight 24 inches, he stated that a force necessary to cause such a break could be a 24-pound ball dropped but one inch, similar to the test of the State’s expert. He demonstrated by mathematical formula that such a force would be moving at the rate of approximately one and one-half *611 miles per hour. He felt that it was not unreasonable for a man, in attempting to close a faucet, to use a fraction of his weight in so doing, as claimant had done in the instant case and to have the same result as occurred here — a broken faucet handle.
From the evidence, it is apparent that the faucet handle was under the exclusive control and maintenance of the State and the accident would not have occurred if proper care had been exercised. The inference raised by the res ipsa loquitur rule has not been rebutted by testimony and evidence produced on behalf of the State.
The court must accept the claimant’s testimony concerning his conduct and the manner in which he acted just prior and up to the time the handle broke. The assistant who was present at the time and with whom claimant had been conversing just prior to his accident was not produced as a witness by either party.
Thus, the essential problem of fact which faces the court is whether claimant, in approaching the washbasin and addressing the handle as he described —which the court finds was with the use of reasonable pressure or force — could have exerted the energy which the experts testified was necessary to brittle-break such a handle and the metallic screw stud inside of it. It is noted that the claimant testified that he was right handed and was a tennis player and occasionally played golf. Thus, the court finds that it is dealing with a person who had better than average strength in his right wrist.
After very careful consideration of claimant’s testimony as to his conduct and actions with respect to his effort to reduce the extent of the drip and the expert testimony concerning the quantum and nature of the force necessary to brittle-break a similar handle and its metallic screw stud, the court finds that the force used by claimant, which the court has found to have been reasonable, was sufficient to satisfy the expert’s requirements that it be at least equivalent to a 24-pound object moving one inch at the rate of approximately one and one-half miles per hour. In arriving at this critical finding the court has considered the leverage and motion that could result from the placing of claimant’s right foot forward, the dipping of his right shoulder, the exertion of energy through his upper arm, elbow and lower arm, and the twisting outward and lowering of his wrist and the court has found that by all of this he could have exerted the quantum and quality of energy found by the experts to have been necessary to cause a brittle-break of the type that occurred here.
In making this critical finding the court also considered the material from the hospital record and from the report prepared by claimant’s employer which were to the effect that claimant *612 was * ‘ forcing ’ ’ a water handle and that he attempted to close a water faucet “ with the base of my right palm.” While the word ‘ ‘ forcing ’ ’ may suggest more energy or effort than would be reasonable, it is also possible to construe the word as being equivalent to reasonable, normal effort to turn a handle to a closed position. The court does not find the use of this word by a hospital staff member (who was not a native American) to be adverse to or inconsistent with the claimant’s testimony as to his conduct and actions just prior to and including the moment of his accident. Claimant also produced a linguist who testified that based on this foreign staff member’s native tongue, he could have heard the word “ twist ” and translated it into and out of his native tongue and have come out with a form of the word “ force.” Other parts of the hospital record used language ‘ ‘ closing water faucet ’ ’ and ‘ ‘ handle broke in his hand while twisting it.” In contradistinction to this staff member’s use of the word “ forcing ”, the surgeon who actually operated on the claimant and who had better command of the English language, testified that he took his own history from the claimant and that his record showed the injury occurred “ while twisting faucet.” With respect to the language in claimant’s employer’s accident report — namely that he attempted to close the water faucet with the base of his right palm — the court notes that claimant denied that he said this and denied that he reported at all to the newspaper staff person who signed the report.
In any event, the court finds that this language, standing by itself, is hardly sufficient to change the above-described view and interpretation of events which the court has found and adopted with respect to the happening of the instant accident. Assuming, but not conceding, that claimant did use the base of his right palm, the force which he applied could still have been reasonable and the same as the court has found that he applied in accordance with his testimony that he gripped the handle with his fingers and his thumb extended. Under the latter view of the events, the pressure point of contact with the porcelain handle still would have been an area of his palm and could well have been what someone might have described as the base of the palm.
The court further finds that claimant was not contributorily negligent as to the manner in which he addressed and turned the faucet handle, and the amount of force applied was not exorbitant or anything other than reasonable and what a person would ordinarily use in attempting to stop or abate the drip. The court finds that the State was negligent in the maintenance and care of the faucet, that it has not overcome the presumption *613 of its negligence arising out of the res ipsa loquitur rule which applies here, that such negligence was the competent and producing cause of claimant’s injuries, and that claimant was free of contributory negligence.
After the accident, claimant testified his wrist was bleeding profusely from a two-inch laceration in the middle of his wrist near the base of his palm. He received first aid from the nurse at 80 Centre Street and was taken to Beekman-Downtown Hospital in an ambulance summoned by the police who were immediately notified of the accident.
At the hospital, his injury was ascertained to be a severance of the median nerve and the palmaris longus tendon of the hand and of the flexor sublimis of the index and middle finger, and a partial severance of the flexor pollicis longus and flexor carpi radialis longus tendon, all of the right hand.
Surgery was performed, repairing the median nerve, and the flexor carpi sublimis tendon. The palmaris longus tendon was excised. His arm was elevated and immobilized in a cast and claimant remained in the hospital until June 30, a period of 18 days.
A physical rehabilitation specialist was consulted during his hospital stay and a series of treatments and exercises was directed and performed during the summer and after release from the hospital. Claimant saw this specialist after his discharge on several occasions. He also visited the offices of his surgeon for postoperative treatment. As the result of the accident, as testified to by his surgeon, claimant has suffered a permanent loss of sensation at the distal ends of the right thumb, index and middle fingers, and some loss of sensation in his right palm. A particularly bothersome result of the accident has been a growth on the site of the injury which at the time of the trial was about three quarters of an inch in diameter and one quarter of an inch high and which is quite painful when bumped.
Claimant’s surgeon testified as to his diagnosis, treatment and prognosis. The reasonable value of his service was $750. The hospital bill was $763. Claimant’s surgeon indicated a permanent disability to claimant’s hand of 40-50%.
Claimant has continued to progress in his chosen profession. And while the injury has not hampered his professional work, it has very considerably affected many of his personal and professional activities. It takes more time to do things, he must use his left hand more — which is awkward, his handwriting has deteriorated, he must type some of his notes before they become stale, and his right hand and wrist tire quickly. Bumps of the growth on his wrist are a frequent source of pain and *614 discomfort. His testimony was that in his efforts to participate in active sports, he is severely limited by the accident results. Most serious is the loss of sensation in the fingers and palm and the weakened condition of his wrist. Also, in addition to the pain which claimant suffers when the growth on his wrist is bumped, his surgeon testified that the cause for the growth is not known, that he had recommended exploratory and corrective surgery which would involve a substantial hospital stay, and that to date the claimant had not acted on this recommendation. Thus, there is here also a clear prospect of future surgery together with the difficulties, uncertainties and costs that such surgery would involve.
The State’s motions to dismiss for failure to state a cause of action, made both at the end of claimant’s case and renewed at the end of the State’s case, upon which decision was reserved, are now denied.
At the time of the accident, which occurred in 1964, claimant was 30 years old. At the time of the instant trial, he was, therefore, about 34 years old.
The court has considered claimant’s age, his pain and suffering, the fact that he has a permanent partial disability, the effect of the injury on his work efforts, daily life activities and recreational interests, the disfigurement which he suffered, the growth on his wrist and the necessity which it creates for future surgery and the costs involved, and the medical and hospital costs incurred to date and finds that for all damages suffered by claimant, including medical expenses past and future, the court awards the sum of $30,000.
The foregoing constitutes the written and signed decision of this court pursuant to CPLR 4213. Let judgment be entered accordingly.